IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSE ARNALDO RODRIGUES,                        No. C 96-01831 CW

     Petitioner,                              ORDER DENYING
                                               PETITION FOR WRIT
    v.                                         OF HABEAS CORPUS

W.L. MONTGOMERY, Warden,

     Respondent.

_____/

On May 27, 1999, Petitioner Jose Arnaldo Rodrigues, a state prisoner incarcerated at California State Prison in Corcoran, California, filed a petition for a writ of habeas corpus asserting forty-seven claims.  On January 11, 2002, Respondent filed an answer.  On April 7, 2014, Petitioner filed a traverse.  In his traverse, Petitioner also seeks discovery and an evidentiary hearing on some of those claims.  Respondent has filed a reply, and Petitioner has filed a response.  Having considered all of the papers, the Court denies Petitioner's discovery requests, denies his request for an evidentiary hearing, and denies the petition.

BACKGROUND

I.  Statement of facts

The following facts are taken from the December 1, 1994 opinion of the California Supreme Court on direct appeal from the jury verdict.  People v. Rodrigues, 8 Cal. 4th 1060 (1994).

    1. The Prosecution Case
       Epifanio Zavala testified that in May 1987, he was living with his older brother Juan Barragan in an apartment on the second floor of a two-story building at 1100 Sevier in Menlo Park.  Zavala was then 19 years old and Barragan was 21.

Although Zavala and Barragan previously worked in restaurants, they did not have jobs the first week of May 1987. Barragan sold small amounts of cocaine and heroin to help make a living. Zavala sometimes helped out by giving drugs to customers. One of those customers was Cynthia Ontiveros, a heroin addict who had bought heroin from the brothers on several occasions.

Ontiveros testified to the following. Although she lived in Hayward with her boyfriend, Richard Lopez, she was in love with Juan Garcia. At approximately noon on May 4, 1987, Ontiveros left Hayward to buy some heroin from Zavala at his apartment. Zavala sold her approximately one gram of heroin for $100. After telling Zavala she might come back, Ontiveros returned to Hayward. During the course of the day, Ontiveros injected about half of the heroin and sold the rest.

At approximately 5 p.m. that evening, Ontiveros was selling heroin in front of the El Tanampa bar on B Street in Hayward. Garcia drove up in defendant's car, with defendant in the passenger seat. Garcia asked Ontiveros how he could make some money. Ontiveros told him not to worry about it, that she would find a way. She told Garcia to meet her at the bar later in the evening.

Garcia and defendant met Ontiveros at the bar after dark. Ontiveros told Garcia she had a connection from whom they could get drugs, and identified Zavala and Barragan because they were young and naive drug dealers who "weren't rough." Ontiveros had never seen the brothers with weapons and had never seen them use or threaten violence in their drug dealing. She thought Garcia and defendant could get drugs from them without a big fight.

Ontiveros, Garcia and defendant then planned how to get the drugs from Zavala and Barragan. They agreed that Ontiveros would go to the apartment first because the brothers knew her and would open the door for her. Once the door was open, Garcia and defendant would rush in and scare the brothers into giving up their drugs. Garcia asked Ontiveros if Zavala and Barragan had any weapons, and she responded that she had never seen any and did not think they had any. Ontiveros apparently thought that the brothers might be beaten or roughed up a little bit, but did not expect any further violence. Ontiveros, Garcia and defendant agreed to use defendant's car, a beige Lincoln, to drive to the brothers' apartment.

Sometime around 11 p.m., Ontiveros, Garcia and defendant arrived at the apartment. Garcia was dressed in black pants, black shoes and a black jacket. Defendant wore a beige long-sleeved jacket. Garcia, who was driving, stopped the car on Sevier Street, some seven or eight houses down from the apartment. Ontiveros went to find out who was in the apartment. It was agreed that Ontiveros would let Garcia and defendant know if the brothers were alone.

Ontiveros went upstairs to the apartment and knocked on the door. Zavala let her in. Once inside, Ontiveros saw Barragan asleep on the couch but did not see anyone else. Zavala told Ontiveros that he had not expected her to return,

and that he had no more drugs.  After some discussion, Zavala indicated he would give her some money for a "date" if she would stay.  After agreeing to this, Ontiveros said she was going to tell her friend who was waiting for her in a car. Zavala walked downstairs with Ontiveros, then went to his own car and locked it while she kept walking.  Zavala returned to the apartment and waited for Ontiveros.

After Zavala went upstairs, Ontiveros walked to defendant's car.  She told Garcia and defendant that the brothers did not have any drugs, but that they did have money.  When Garcia asked how much money, Ontiveros replied she did not know, but said they must probably have "a good amount" because Zavala had not yet bought more drugs. Ontiveros, Garcia and defendant agreed to proceed with the plan to rob the brothers, but to get money instead of drugs.

Garcia moved defendant's car to Madera, the next street over, and parked it approximately 20 to 30 feet from Pierce Road.  Ontiveros walked to Madera and met Garcia and defendant there.  She saw Garcia obtain an object that looked like a crowbar from the trunk of the car, and noticed defendant had a large knife.  The three walked together back to the apartment building.

As planned, Garcia and defendant went up the back stairs.  Ontiveros walked up the front stairs, and knocked on the door.  As Zavala let her in, she saw that Barragan was still sleeping on the couch.  At that point, Garcia and defendant rushed into the apartment.  Garcia hit Zavala with his tire iron and knocked him back onto Ontiveros.  Ontiveros became scared and ran back to defendant's car.  She waited in the front seat for several minutes until Garcia and defendant returned.

Zavala testified that once inside the apartment, Garcia struck at Zavala's head repeatedly with a tire iron, forcing him back into the apartment through the living room.  Zavala yelled at Barragan to wake up.  As Barragan stood up, Zavala saw the second attacker, who was wielding a knife in his left hand, hold his brother up against a wall.  Zavala, who at this time was being held to the ground and beaten by Garcia, saw the second attacker trying to stab his brother in the face or throat.  After the attacker and Barragan fell to the floor during the struggle, the attacker reached over and stabbed Zavala in the left leg and right foot.

During the course of the attack, Garcia said to Zavala: "Calmate cabron, [¿]donde la tienes?"  According to Zavala, this translated in English to: "Calm down, damn it, where do you have it?"  Zavala answered with a lie, saying "it" was in the closet.  He was hoping to have a chance to help his brother if the attacker went to look in the closet.  After Zavala responded, however, the man with the knife told Garcia in English to "finish him too."  Garcia stabbed Zavala in the back with the pointed end of the tire iron, penetrating to the bones.  At that point, the telephone started ringing and the man with the knife said: "Well let's get out of here the police might going to come [sic]."  As the two assailants fled from the apartment, Zavala could see that the one with the knife had an injured arm.

After the assailants left, Zavala answered the phone, which had continued to ring.  The caller was Maria Vargas, a friend and neighbor from an apartment downstairs.  Zavala told Vargas his brother was dead and to call the police.

Vargas testified that she immediately dialed 911 from a telephone located next to her bedroom window.  As Vargas was reporting the murder, she saw two men come down the apartment stairway and pass by the window.  Since a light had been shining on the stairway landing that night, Vargas saw the two men clearly enough to provide the following details.  The first man was a "dark man" who wore dark clothes, had blood on his left hand, and held his left arm down by his side with his right arm across his chest.  After reaching the bottom of the stairs, the man stopped and looked through the window at Vargas and her daughter; he then hurried off toward Pierce Street.  The second man was an Hispanic with light skin and straight hair.  He was about four steps behind the first man as they came down the stairs.  The second man also looked through the window at Vargas as he rushed by.

Vanessa Sturns lived in an apartment building next to 1100 Sevier.  She testified that shortly after midnight on the morning of May 5, 1987, she got into her car and was beginning to drive to a liquor store when she saw two men in dark clothes climb over a fence into the backyard of her apartment building and walk to Madera.  Sturns noticed the men because she had never seen anyone jump that fence before.  Because the area was "nicely lit," she could tell that the two men were Hispanic, and that they were not "Black."  Sturns was approximately one and a half car lengths from the men as she observed them.  As Sturns drove off, she saw a car parked on Madera, about five houses up the street.

Ontiveros testified that when Garcia and defendant returned to the car, Garcia took the driver's seat and defendant sat in the passenger side.  Defendant had a deep cut on his left forearm.  Garcia had blood on his face and hands, but he was not injured.  Defendant told Ontiveros to clean the blood off Garcia.

As they drove back to Hayward, defendant climbed into the backseat and lay down.  He told Ontiveros to look straight and act normal.  There was some discussion between Garcia and defendant about the knife, and as they approached a bridge, Ontiveros felt a rush of air as if the rear window had been rolled down.  Although she did not see defendant throw the knife out, she did not see the knife in the car again.  Ontiveros told defendant not to worry, she would not say anything about what had happened.

The three stopped for about half an hour in Hayward while Garcia changed his shirt and defendant changed his pants.  Defendant also took his jacket off to wrap his arm, which was bleeding badly.  Garcia stayed at that location, and Ontiveros dropped defendant off at his sister's house in Hayward.  Ontiveros then drove to her place.  The next day, pursuant to Garcia's instructions, Ontiveros washed the blood out of the interior of the car.  Later on, defendant's brother, Raymond Rodriguez (hereafter Raymond), came by and retrieved the car.

United States District Court
For the Northern District of California

Defendant's sister Norma testified that at approximately 4:10 in the morning on May 5, 1987, defendant came to her house and told her he had been working on his car. He asked for a bandage and requested to be taken to Raymond's house in Oakland.

Raymond testified that defendant told him a transmission had fallen on his arm. He acknowledged, however, having testified at the preliminary hearing that although defendant told him to say that the transmission had fallen while the two of them were working on defendant's car, the two had not actually worked together on the transmission for a week or two before defendant's arm was injured. When Raymond drove the car back from Ontiveros's place in Hayward, he had no trouble with the transmission. Raymond took defendant to Highland Hospital at 5:50 in the morning on May 5 to get his arm treated.

Dr. William Billings from Highland Hospital testified that although defendant stated that a transmission fell on his left arm, no dirt or grease was found in the wound. Also, the wound appeared to have been caused by a sharp instrument, rather than a blunt one, and was sufficiently clean that the surgery team was able to sew the tissue together fairly precisely and match a tattoo that had been split apart. Hospital records reflected that defendant was left-handed.

Officers arriving at the scene of the crime found Barragan lying dead on the floor with a massive pool of blood around his head and neck area. Barragan's chest was split wide open, and part of his face was hanging off. The officers saw Zavala rolling around on the floor in pain. Zavala had been severely beaten and his face was completely covered with blood. He was also missing several teeth. Zavala lapsed in and out of consciousness, sometimes screaming or moaning about his pain.

Zavala was taken to Stanford Hospital, where Detective James Simpson interviewed him at approximately 1:30 or 1:45 a.m. Zavala told him that two male Hispanic assailants and a female named Cyndia were involved. On or about May 17, 1987, Zavala picked Ontiveros out of a photo lineup.

Detective Ronald Williams testified that on May 6, 1987, Zavala described the knife wielder as being an Hispanic male adult, 23 to 24 years of age, 5 feet, 9 to 10 inches tall, 160 pounds, straight dark brown hair to his collar, and a very dark complexion. When Williams subsequently showed Zavala a photograph taken of defendant at the time of his arrest on May 28, 1987, Zavala said that the man in the photo looked Black to him, and that the skin tone and hair length in the photo closely resembled the knife wielder as he appeared the night of the murder. A citation issued to defendant on May 2, 1987, gave his weight as 170 pounds, and height as 5 feet, 8 inches tall.

On July 19, 1987, a search team found a survival-type knife alongside the freeway in the area where Ontiveros thought defendant had rolled down the rear car window as they drove from the crime scene. The knife had bloodstains both on its blade and hilt and on a capsule contained inside the

handle.  The knife blade was just short of nine inches, with a maximum width of one and one-half inches.  Ontiveros, upon being shown the knife, immediately identified it as the one carried by defendant.

The forensic pathologist's autopsy of Barragan disclosed 21 stab and incise wounds consistent with infliction by a large knife-type instrument.  Six of the wounds were to the face and head, one of which was a large, irregular, jagged wound in the lip that went through to the anterior part of the neck.  There was a six-inch-deep wound in the right leg above the knee.  One four-inch-deep stab wound in the chest had cut the rib cartilage in half and sliced the right lung, while another one five inches deep had also damaged the right lung.  There was also a large, gaping, complex, eight-inch-deep wound, possibly caused by several thrusts through the same skin hole, that cut the right jugular vein in half and perforated the right lung.  The location of the wounds to the torso and upper body was consistent with overhand-type thrusts.  Of the 21 wounds, 17 were located on the right side of the body, while 4 were on the left; this was consistent with face-to-face stabbing by a left-handed assailant.  The cause of death was loss of blood with air embolism.

Three bloody fingerprints, apparently made by the same finger, were found at the crime scene.  They had an arch pattern found only in 5 percent of the population, and did not match the prints of the victims, the suspects or those persons whose presence at the scene was logged.  A smeared set of comparison prints for James Williams, a tenant in a nearby unit, showed an arch pattern, but Williams could not be located to make a further comparison.

An examination of defendant's car disclosed one of Garcia's fingerprints, but none of defendant's.  However, on the back of the front seat backrest, police found a partial shoe print that had the same class characteristics as a pair of shoes belonging to defendant.  Those shoes indicated the presence of blood in two spots.

Prosecution criminalist Elizabeth Skinner performed a blood-typing analysis, and determined that Zavala and Barragan both had type A blood, differing only in the EAP genetic marker system. Defendant and Garcia both had type O blood.  In the TF (or transferrin) genetic marker system, defendant's type was CD, a type shared by less than 3 percent of the population.  Neither Garcia nor the two victims had CD transferrin.

Although various bloodstains were found in defendant's car and a few blood drops were discovered outside the apartment, many were of insufficient quantity to perform blood-typing analysis.  However, type O blood, with the CD type in the TF system, was discovered on the floormat in defendant's car.  Blood on a paper tissue in the trunk of the car was found to be consistent with the blood of either Zavala or Barragan, but not with the blood of defendant or Garcia.  Of three spots of blood found outside the brothers' apartment on the pavement leading to Pierce Road, one may have been type A or a mix of type A and type O; the other two were insufficient to produce test results.

Inside Zavala's apartment, there were copious bloodstains on the living room carpet and walls.  Blood was found on the front door, the couch, the television, the stereo, a telephone book, a mattress in the bedroom, and on the walls, sink and window in the bathroom.  Skinner tested the blood samples and was able to determine that all of the blood surrounding Barragan was consistent with his type. Although Skinner could not say that blood belonging to defendant was found in the apartment, she opined, in response to hypotheticals, that if an attacker had been bleeding from a forearm wound, the attacker's blood might not be found if the length of the attack was a matter of minutes and the wound was enclosed in the long sleeve of a jacket so that the clothing would absorb the blood.  She also indicated that because Barragan had bled so profusely, small amounts of an attacker's blood might go undetected.

Skinner also tested the blood on the knife found by the freeway.  Skinner testified that the hilt of the knife had human blood on it, but that a lot of the blood on the blade, being very dry and crusty, had flaked off by the time she examined it.  As for the bloodstains found on the plastic capsule inside the knife handle, Skinner found a strong reaction for type O blood, and a weak reaction for type A blood, suggesting the possible presence of both types.

2. The Defense Case

Defendant did not take the stand. His defense was that he was not present and had nothing to do with the crime. There was no physical evidence placing defendant at the scene, and the surviving victim could not positively identify him.

Maria Vargas had initially described the first man to come down the stairs on the night of the murder as a "Black" man when speaking to the 911 dispatcher and the police. Vargas failed to identify defendant when shown a photo lineup on May 27, 1987, and identified him for the first time at the preliminary hearing. At that hearing, defendant was wearing an orange jumpsuit and was seated at the defense table behind a nameplate that said "defendant."

Nathan Howard, testifying for the defense, disclosed that he had known Juan Garcia since 1967, and in the past had even identified himself as Garcia's "partner." Although he had met defendant a couple of times, he was unaware of any friendship between defendant and Garcia, and had never seen them socialize together. Howard also testified that he knew defendant's brother, Raymond, and that he had run into Raymond at Highland Hospital one morning in May 1987. Raymond told Howard that a transmission had fallen on defendant's arm.

Defendant's sister, Norma, testified that when defendant arrived at her home at 4:10 a.m. on or about May 5, 1987, he was covered with dirt and grime, and had car grease on his face and hands. Although defendant asked for a bandage and

wanted to be taken to Raymond's house, Norma did not notice that he was injured, or that he needed to go to the hospital. Defendant said he had been working on his car. He was bald at the time, and looked normal but dirty.

Petitioner was convicted by a jury of one count of murder, two counts of attempted robbery, one count of burglary, and the special circumstances that he committed the murder while engaged in the crime of robbery or attempted robbery and while engaged in the crime of burglary. Petitioner was sentenced to death by the same jury.

II.   Procedural background

Petitioner appealed his conviction and sentence to the California Supreme Court, which, on December 1, 1994, upheld the judgment in its entirety, finding "no prejudicial error at the guilt or penalty phase of [Petitioner's] trial." Rodrigues, 8 Cal. 4th at 1095.   In 1994 and 1998, Petitioner filed habeas petitions in the California Supreme Court.   The court denied all of the habeas claims in Petitioner's 1994 petition on the merits, except claim seventeen, which was denied as moot.   The court also denied claim four in part with regard to one allegation on the independent ground that Petitioner failed to raise the issue on direct appeal.   The court denied all of the habeas claims in Petitioner's 1998 petition on the merits, as well as some claims as untimely, successive, or for failure to raise on appeal.   On May 27, 1999, Petitioner filed the present petition.

On September 25, 2002, this Court stayed all proceedings on Petitioner's federal habeas petition pending litigation in state court concerning his entitlement to relief under Atkins v. Virginia, 536 U.S. 304 (2002), which prohibits execution of the

8

United States District Court
For the Northern District of California

mentally retarded.  On February 8, 2010, pursuant to Atkins, a stipulation and order were filed in the Superior Court of San Mateo County vacating Petitioner's death sentence and sentencing him to life imprisonment without the possibility of parole.

Given the state court action, on July 12, 2010 this Court denied as moot claims six through eight, twenty-three, twenty-five through forty, forty-two, forty-three, forty-five, and forty-six of Petitioner's petition, because they were related only to the death penalty.

Remaining for adjudication are the following claims: claim one: Petitioner was tried while incompetent; claim two: the trial court failed to hold a competency hearing; claim three: ineffective assistance of counsel for failure to seek a competency hearing; claim four: juror misconduct; claim five: bias in jury selection; claim nine: ineffective assistance of trial counsel during the guilt phase of trial; claim ten: ineffective assistance of counsel due to trial counsel's conflict of interest; claim eleven: admission of videotape evidence; claim twelve: admission of unreliable hearsay identification evidence; claim thirteen: exclusion of impeachment evidence; claim fourteen: prosecution's failure to preserve evidence; claim fifteen: innocence of capital murder; claim sixteen: prejudicial re-reading of testimony during deliberations; claim seventeen: insufficient evidence; claim eighteen: denial of the right to present a defense; claim nineteen: errors in jury instructions; claim twenty: prosecution's failure to disclose impeachment evidence; claim twenty-one: prosecution's use of false testimony and failure to correct false testimony; claim twenty-two: withholding of discovery; claim

twenty-four: witness tampering; claim forty-one: erroneous removal of potential jurors for cause; claim forty-four: ineffective assistance of appellate counsel; and claim forty-seven: cumulative error.

In addition to his request for relief on the merits, Petitioner requests discovery on claims four, five, nine, ten, and twenty and an evidentiary hearing for claims one, three, four, five, nine, ten, fourteen, twenty and twenty-one.

III. Procedural Default

Under the independent and adequate state ground doctrine, federal courts will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991), overruled on other grounds by Martinez v. Ryan, 132 S. Ct. 1309 (2012). In the habeas context, this doctrine furthers the interests of comity and federalism. Id. at 730. The doctrine of procedural default is a specific application of the adequate and independent state ground doctrine that bars a federal court from granting habeas relief when a state court declined to address the claim because the petitioner failed to meet a state procedural requirement. Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). This doctrine helps ensure that the state criminal trial remains the "main event" rather than a "tryout on the road" for a later federal habeas proceeding. Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

The procedural default analysis requires two steps. First, the court must consider whether the procedural rule invoked by the

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

last state court to render judgment in the case to bar a claim is both "independent" and "adequate" to preclude federal review. Second, if the bar invoked is independent and adequate, federal review of the merits of the claim will be barred unless the petitioner can show cause and prejudice or a fundamental miscarriage of justice.  See Maples v. Thomas, 132 S. Ct. 912, 922 (2012); Coleman, 501 U.S. at 750; Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999).  Constitutionally ineffective assistance of counsel will satisfy the cause test, Walker v. Martel, 709 F.3d 925, 938 (9th Cir. 2013), as will "some objective factor external to the defense" that impedes counsel's efforts to comply with the procedural rule, Murray v. Carrier, 477 U.S. 478, 488 (1986).  To demonstrate prejudice, a petitioner must "shoulder the burden of showing, not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).  The miscarriage of justice exception applies where "new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" McQuiggin v. Perkins, 133 S. Ct. 1924, 1933 (2013) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).

A.   Untimeliness

Respondent contends that claims four, five, nine, ten, twelve, thirteen, fifteen, nineteen, twenty, and twenty-one are procedurally defaulted and therefore barred from federal review because the California Supreme Court denied these claims as untimely.  Petitioner disagrees, stating that his petition was

filed prior to the issuance of <u>In re Robbins</u>, 18 Cal. 4th 770 (1998), and that California's untimeliness rule was neither adequate nor independent at that time.

### 1.   California's Untimeliness Rule

"California does not employ fixed statutory deadlines to determine the timeliness of a state prisoner's petition for habeas corpus.  Instead, California directs petitioners to file known claims 'as promptly as the circumstances allow.'" <u>Walker v. Martin</u>, 562 U.S. 307, 310 (2011) (quoting <u>In re Clark</u>, 5 Cal. 5th 750, 765 n.5 (1993)).  Under California's Supreme Court Policies Regarding Cases Arising From Judgments of Death, Timeliness Standards (Policies), a habeas corpus petition is presumed to be filed without substantial delay if it is filed within 180 days from the due date of the reply brief on direct appeal, or within thirty-six months after the appointment of habeas counsel, whichever is later.[1]

Petitioner's appellate counsel was appointed on August 7, 1989 and maintained continuous representation throughout his first state petition for writ of habeas corpus.  Ex. 162 at 4.  There was no separate appointment of habeas corpus counsel.  The reply brief in Petitioner's appeal was due and filed on August 17, 1993. His first state petition for habeas corpus was filed on November 10, 1994, 450 days after the submission of the reply brief in his appeal and more than four years following the appointment of

---

[1] When the Policies were first propounded in 1990, petitioners were afforded a presumption of timeliness for sixty days following the due date for the reply brief on direct appeal. This presumption period was extended to ninety days on January 22, 1998, and then to 180 days on July 17, 2002.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

appellate counsel.  His second state habeas petition was filed on March 6, 1998, an additional two and a half years later.  All of the claims that Respondent asserts are barred by the adequate and independent untimeliness bar are from Petitioner's second state petition for writ of habeas corpus.  Under the Policies, even the first state petition for writ of habeas corpus, when the untimely claims should have been raised, was not presumptively timely.

> 2.   Adequacy of the Untimeliness Bar

For a state procedural rule to be "adequate," it must be clear, well-established at the time of the purported default, and consistently applied.  Calderon v. United States Dist. Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996).  The critical date for judging the bar's adequacy is the date the first state habeas petition was filed.  See Calderon v. United States Dist. Court (Hayes), 103 F.3d 72, 75 (9th Cir. 1996).  Here, that date is November 10, 1994.

The state bears the ultimate burden of proving the adequacy of a state procedural rule.  Bennett v. Mueller, 322 F.3d 573, 585-86 (9th Cir. 2003).  However, once the state has adequately plead the existence of an adequate and independent procedural ground as a defense, the burden to place that defense at issue shifts to the petitioner, who "may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."  Id. at 586.  The petitioner's burden at this stage is "modest."  Dennis v. Brown, 361 F. Supp. 2d 1124, 1129 (N.D. Cal. 2005).  Once a petitioner has placed the adequacy of a particular bar into

question, the ultimate burden is the state's.  <u>Bennett</u>, 322 F.3d at 586.

As the Court explains below, the state has met its burden under <u>Bennett</u> of pleading an adequate state bar.  Under Supreme Court and Ninth Circuit case law, the adequacy of California's untimeliness bar was firmly established in 1993.  <u>Fields</u>, 125 F.3d at 763-64; <u>see also</u> <u>Martin</u>, 562 U.S. at 316-321 (holding that discretion and exceptions do not render California's untimeliness bar inadequate).

In an attempt to remedy adequacy concerns with the untimeliness bar, the California Supreme Court decided <u>Clark</u>, 5 Cal. 4th 750, which clarified the law surrounding the procedural bar of untimely filing and its exceptions.  <u>Clark</u> was "intended to 'reestablish California's procedural rules governing state habeas petitions and clearly define and limit the applicable exceptions.'"  <u>Park v. California</u>, 202 F.3d 1146, 1151-52 (9th Cir. 2000) (quoting <u>Fields</u>, 125 F.3d at 763-64).  Despite the guidance in <u>Clark</u>, however, some federal courts continued to find the untimeliness bar inadequate.

In <u>Bennett</u>, the Ninth Circuit noted the dilemma facing courts trying to assess the post-<u>Clark</u> adequacy of the untimeliness bar.  "Before <u>Clark</u>, the California untimeliness standards were applied inconsistently to some fact patterns."  322 F.3d at 583.  However, the court was unconvinced that <u>Clark</u> remedied the inconsistent application: just because "the California Supreme Court set out [with <u>Clark</u>] to create a rule that would be consistently applied, . . . it does not follow that the rule in historical fact has been so applied."  <u>Id.</u>  It recognized that district courts "had the

14

opportunity to analyze the consistency of application of the Clark rule, reaching opposing results," and remanded for resolution of the adequacy question. Id. at 583-84. Later, in Townsend v. Knowles, the Ninth Circuit held that the government did not satisfy its burden of proof because it offered "no evidence that California operated under clear standards for determining what constituted 'substantial delay' in 2001." 562 F.3d 1200, 1208 (9th Cir. 2009), abrogated by Martin, 562 U.S. 307.

In Martin, the United States Supreme Court granted certiorari to determine the adequacy of California's untimeliness bar. 562 U.S. at 315. In reversing the Ninth Circuit's decision holding the bar to be inadequate, which had relied on Townsend, the Supreme Court stated that a "discretionary rule ought not be disregarded automatically upon a showing of seeming inconsistencies. Discretion enables a court to home in on case-specific considerations and to avoid the harsh results that sometimes attend consistent application of an unyielding rule." Id. at 320. Martin thus vitiated the argument that the untimeliness bar is inadequate, finding "no inadequacy in California's timeliness rule generally." Id. at 321.

Petitioner makes several arguments attempting to distinguish the Supreme Court's conclusion that the rule in Clark is adequate. First, he argues that Martin does not apply to his case because his first habeas petition was filed in 1994, several years prior to the issuance of Robbins. See Park, 202 F.3d at 1152-53 (explaining that in Robbins the California Supreme Court adopted a prospective approach declining to consider federal law when deciding whether claims are procedurally defaulted). However, as

United States District Court
For the Northern District of California

discussed below, Robbins addressed the untimeliness bar's independence, not its adequacy.

Second, he argues that Martin did not overturn Ninth Circuit case law holding that, prior to the issuance of Robbins, the rule was not adequate.

Third, he argues that Martin does not apply here because it did not address adequacy in capital cases. However, the California Supreme Court established the rule's adequacy, even in capital cases, in 1993 with Clark. In King v. LaMarque, 464 F.3d 963, 966 (9th Cir. 2006), the Ninth Circuit made clear that Clark itself contemplated capital cases. The court stated:

> California's timeliness rule applies to both capital and noncapital cases. In capital cases, California's [Policies] create a presumption of timeliness if a petition "is filed within 90 days of the final due date for the filing of an appellant's reply brief." Clark, 21 Cal. Rptr. 2d 509. The Policies also create more explicit standards for deciding whether there has been substantial delay when the petitioner has filed after the ninety-day presumption period. Id. at 751-53. Clark clarified the application of these Policies within capital cases and provided four specific exceptions for granting review even when a petition's "substantial delay" is unjustified. Id. at 758-59.

Id. Thus, even before the Supreme Court concluded in Martin that Clark established an adequate procedural bar in 1993, the Ninth Circuit made clear that Clark applied to capital cases.

Petitioner has not made a showing sufficient to rebut the adequacy of the untimeliness bar, as required by Bennett. Accordingly, the Court concludes that Respondent has met his burden of pleading an adequate state bar and that Petitioner has failed to satisfy his burden.

//

//

**United States District Court**
For the Northern District of California

### 3.   Independence of the Untimeliness Bar

The procedural bar must also be independent when applied to result in a default.  In 1998, the California Supreme Court decided Robbins, declaring that it would no longer consider federal law when denying a habeas claim as procedurally barred for untimeliness.  18 Cal. 4th at 811-12.  In Bennett v. Mueller, the Ninth Circuit explained that a post-Robbins denial based on California's untimeliness bar is an independent procedural ground. 322 F.3d at 581-83.

The question of whether the application of a procedural rule was independent of federal law is assessed at the time the state court rejects a claim as procedurally defaulted, because the issue is whether that state court decision was based solely on state law.  See, e.g., Park, 202 F.3d at 1153 ("Robbins is clear . . . that its new approach is prospective, and would not have applied when the California Supreme Court denied Park's habeas petition"); Dennis, 361 F. Supp. 2d at 1127 ("To determine whether a state-court decision is independent of federal law, a federal court must examine the decision itself in which the state court invoked the procedural bar, as distinguished from other state-court decisions issued at or prior to the time that the purported procedural defaults occurred.").  The decision at issue here was in 2001, three years following the issuance of Robbins.  Accordingly, Respondent has plead the existence of an independent procedural bar.

Because Petitioner has failed to satisfy his burden under Bennett, claims four, five, nine, ten, twelve, thirteen, fifteen, nineteen, twenty, and twenty-one are procedurally defaulted

17

because they are barred by the adequate and independent untimeliness bar unless Petitioner can show cause and prejudice or a fundamental miscarriage of justice.  Because the determination of whether Petitioner is entitled to exceptions to default involves an examination of the merits of Petitioner's claims, the Court will address the exceptions in the context of the merits of each claim, after the discussion of Respondent's other procedural default arguments.  See Batchelor v. Cupp, 693 F.2d 859, 864 (9th Cir. 1982) (stating that, if deciding merits of claims proves to be more efficient than adjudicating exceptions to procedural default, a court may exercise discretion to take this course of action).

        B.   Contemporaneous Objection Rule

        Respondent asserts that claims eleven, twelve, thirteen, sixteen, and nineteen are defaulted in whole or in part based on the independent and adequate state ground of the contemporaneous objection bar.  Respondent does not make any specific arguments regarding any of these claims and instead refers back to the answer.  The answer, however, also makes no specific argument asserting an affirmative defense of procedural default based on the contemporaneous objection bar.  It does contain quotations from the California Supreme Court decision denying Petitioner's appeal that note some instances when Petitioner failed to object in whole or in part at trial.  For example, for claim sixteen, the court found it "unnecessary to decide the issue[] of waiver" and instead denied the claim on the merits.  Rodrigues, 8 Cal. 4th at 1123.

United States District Court
For the Northern District of California

As noted above, to preserve and present an affirmative defense based on procedural default, Respondent must plead "the existence of an adequate and independent state procedural ground." King, 464 F.3d at 967.  Federal Rule of Civil Procedure 8(b)(1)(A) requires Respondent to "state in short and plain terms [his] defenses to each claim."  A recitation of the state court's decision is insufficient on its own to assert an affirmative defense.  Respondent is required to state the defense affirmatively and identify it with sufficient particularity that the court can discern the portions of the claim to which Respondent objects.  Fed. R. Civ. P. 8(c)(1), (d).  Respondent has failed to do so and, therefore, has failed to satisfy his burden under Bennett.  Accordingly, claims eleven, twelve, thirteen, sixteen, and nineteen are not defaulted in whole or in part based on the contemporaneous objection bar, although, as discussed above, claims twelve, thirteen, and nineteen are defaulted based on the untimeliness bar.

C.   Successive Claims

Respondent alleges that claims four, five, nine, ten, fifteen, twenty, and twenty-one are defaulted due to the adequate and independent bar against successive claims and petitions.  The California Supreme Court bars "newly presented grounds for relief which were known to the petitioner at the time of a prior collateral attack on the judgment," as well as claims that are presented in a piecemeal or delayed fashion.  Clark, 5 Cal. 4th at 768.

As noted above, Petitioner filed two petitions for writ of habeas corpus in the California Supreme Court.  The first was

filed on November 10, 1994, and the second on March 6, 1998.  In its order denying the second petition, the California Supreme Court denied as successive the claims that are numbered four, five, nine, ten, fifteen, twenty, and twenty-one in the present petition.

Nonetheless, Respondent has failed to plead the existence of an adequate and independent successive claims state bar. Respondent relies on the reasoning in <u>Martin</u> to support the claim that this bar is adequate to preclude review.  He also relies on district court decisions that use <u>Martin</u> to support the adequacy of this particular bar.

However, the Ninth Circuit recently held that <u>Martin</u> dealt specifically with the untimeliness bar and was limited in its reach because it applied only to truly discretionary rules.  <u>Lee v. Jacquez</u>, 788 F.3d 1124, 1129-31 (9th Cir. 2015), <u>rev'd on other grounds by</u> <u>Johnson v. Lee</u>, 136 S. Ct. 1802 (2016).  In light of <u>Lee</u> and the Circuit's prior case law refusing to find the bar adequate, Respondent fails to meet his burden.  These claims, therefore, are not procedurally defaulted on this ground, though they are precluded from federal review by the timeliness bar.

D.   Reasserted Claims

Respondent asserts that claims four, five, nine, twelve, thirteen, fifteen, nineteen, twenty and twenty-one are procedurally defaulted because the California Supreme Court rejected them based on two bars that prohibit reevaluating claims after they have been presented previously to the court for consideration.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

First, the California Supreme Court denied the claims that are now numbered twelve, thirteen, nineteen, twenty and twenty-one, "to the extent [they] allege claims other than ineffective assistance of counsel that were raised and rejected on appeal," as barred by In re Waltreus, 62 Cal. 2d 218, 225 (1965). Waltreus provides that "'any issue that was actually raised and rejected on appeal cannot be renewed in a petition for writ of habeas corpus.'" Forrest v. Vasquez, 75 F.3d 562, 564 (9th Cir. 1996) (quoting In re Harris, 5 Cal. 4th 813, 829 (1993)) (emphasis in original). A Waltreus citation does not bar federal review. See Bean, 96 F.3d at 1131. Therefore, the above-referenced claims are not precluded from federal review based on Waltreus. See id.

Second, the California Supreme Court rejected what are now claims four, five, nine, fifteen, twenty and twenty-one, to the extent they "duplicate claims raised and rejected in Petitioner's first petition for writ of habeas corpus," as barred by In re Miller, 17 Cal. 2d 734 (1941). Miller bars the repetitious presentation of claims already presented in an earlier adjudicated petition where there has been "no change in the facts or the law substantially affecting the rights of the petitioner." Clark, 5 Cal. 4th at 769-70; Miller, 17 Cal. 2d at 735. Again, because this bar merely prohibits the repetitious presentation of claims already reviewed by the state court, it does not preclude federal review. See Ylst v. Nunnemaker, 501 U.S. 797, 804 n.3 (1991) ("Since a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default, its effect upon the availability of federal habeas is nil[.]"). Accordingly, claims

United States District Court
For the Northern District of California

four, five, nine, twelve, thirteen, fifteen, nineteen, twenty, and twenty-one are not procedurally barred by the California Supreme Court's refusal to revisit them because they had been presented in earlier filings.  They are, however, barred from federal review by the independent and adequate state timeliness bar, as noted above.

E.   Failure to Raise Claim Five on Direct Appeal

Petitioner alleges that his constitutional rights were violated by the processes used to select and impanel the jury. Respondent asserts that the claim is procedurally defaulted in that the California Supreme Court denied this claim because it "could have been, but w[as] not, raised on appeal," citing In re Dixon, 41 Cal. 2d 756, 759 (1953).  Respondent has failed to plead the existence of this independent and adequate state bar.

Adequacy of the Dixon bar is determined at the time the direct appeal was filed.  Fields, 125 F.3d at 760-61.  The Supreme Court recently addressed California's Dixon bar in the context of a petitioner's June 1999 petition.  The Court explained that, as of that date, the Dixon bar was "firmly established" because "the California Supreme Court eliminated any arguable ambiguity surrounding this bar by reaffirming Dixon in two cases decided before" June 1999.  Lee, 136 S. Ct. at 1805.  The earlier of the two cases, Harris, was decided on July 19, 1993 and modified on September 30, 1993.  Here, Petitioner filed his opening brief in the California Supreme Court on February 22, 1993, before the California Supreme Court firmly established the Dixon bar.  Thus, Respondent has failed to meet his burden of showing that the Dixon bar is adequate to preclude federal review of this claim.  The

claim is, however, procedurally defaulted on the grounds that it was untimely.

IV.  Merits of Petitioner's Claims

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).

Section 2254(d) applies when the claim was "adjudicated on the merits" in state court.  It covers both unexplained and reasoned decisions.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Harrington v. Richter, 562 U.S. 86, 99 (2011) (analyzing a one-sentence order denying a habeas petition under § 2254(d)); Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013) (order that discusses state law claim but not federal claim rebuttably presumed to be rejection on the merits and therefore subject to § 2254(d)).  "The presumption may be overcome

when there is reason to think some other explanation for the state court's decision is more likely." Harrington, 562 U.S. at 99-100. The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. See Ylst, 501 U.S. at 804; Barker v. Fleming, 423 F.3d 1085, 1091-92 & n.3 (9th Cir. 2005); Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir. 2003) (describing the Ninth Circuit's "practice of 'looking through' ambiguous or un-explained state court decisions" following Ylst).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority under the second clause of § 2254(d)(1) if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409. Under AEDPA, the writ may be granted only "where there is no possibility fairminded jurists could disagree

that the state court's decision conflicts with this Court's precedents." <u>Harrington</u>, 562 U.S. at 102.

In reviewing the reasonableness of a state court's decision to which § 2254(d)(1) applies, a district court may rely only on the record that was before the state court. <u>See Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1398 (2011) (holding that new evidence presented at a federal court evidentiary hearing cannot be considered in assessing whether state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" under § 2254(d)(1)).

If constitutional error is found, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Penry v. Johnson</u>, 532 U.S. 782, 795 (2001). Under 28 U.S.C. § 2254(d)(2), a federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Challenges under § 2254(d)(2) fall into two general categories. "First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record . . . Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." <u>Hibbler v. Benedetti</u>, 693 F.3d 1140, 1146 (9th Cir. 2012) (citing <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004)). An unreasonable determination of the facts occurs when the state court fails to consider and weigh highly probative,

United States District Court
For the Northern District of California

relevant evidence, central to the petitioner's claim, that was properly presented and made part of the state-court record. The relevant question under § 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the state court findings are supported by the record. Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004).

A state court need not conduct an evidentiary hearing to resolve every disputed factual question in order for the state's fact-finding procedures to be considered reasonable. Hibbler, 693 F.3d at 1147. The Hibbler court likened the state court's duty to hold an evidentiary hearing -- so that the state court's finding would be entitled to deference under § 2254(d)(2)) -- to the federal court's duty to hold an evidentiary hearing, i.e., an evidentiary hearing is not necessary if the record refutes the petitioner's factual allegations or otherwise precludes habeas relief. See id. at 1147-48. If the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question, it need not have held an evidentiary hearing, and its factual findings must be given deference. See Gulbrandson v. Ryan, 738 F.3d 976, 987 (9th Cir. 2013). The ultimate question "is whether [a state] appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record." Id. (citing Hibbler, 693 F.3d at 1148) (emphasis in original).

However, even if a federal court finds that the state court was unreasonable in resolving a factual dispute without an evidentiary hearing, under 28 U.S.C. § 2254(e)(2), a district

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

court may not hold an evidentiary hearing on a claim for which the petitioner failed to develop a factual basis in state court unless the petitioner shows that: (A) the claim relies either on (i) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).  Diligence for purposes of determining whether a petitioner failed to develop the factual basis in state court "'depends upon whether [the petitioner] made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court[.]'  The failure to investigate or develop a claim given knowledge of the information upon which the claim is based, is not the exercise of diligence." Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (quoting Williams, 529 U.S. at 435) (brackets in original).

Further, "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief." Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) (citing Pinholster, 131 S. Ct. at 1411 n.20 ("Because Pinholster has failed to demonstrate that the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involv[ing] an unreasonable application' of federal law, a writ

of habeas corpus 'shall not be granted' and our analysis is at an end") (quoting 28 U.S.C. § 2254(d))).

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). To the extent a petitioner's claims are governed by § 2254(d)(1), he is not entitled to discovery because "the review of such claims 'is limited to the record that was before the state court that adjudicated the claim on the merits.'" Runningeagle v. Ryan, 686 F.3d 758, 773 (9th Cir. 2012) (quoting Pinholster, 131 S. Ct. at 1398). Before deciding whether a petitioner is entitled to discovery, the federal habeas court must first identify the essential elements of the underlying claim. See Bracy, 520 U.S. at 904-05 (holding that, difficulties of proof aside, petitioner's allegation of judicial bias, if proved, would violate due process clause). The court must then determine whether the petitioner has shown "good cause" for appropriate discovery to prove his claim. See id.

Good cause for discovery is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." Id. at 908-09; Pham v. Terhune, 400 F.3d 740, 743 (9th Cir. 2005). "Federal courts sitting in habeas," however, "are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." Williams, 529 U.S. at 437.

Petitioner seeks discovery and an evidentiary hearing on some claims. In its July 12, 2010 order, the Court required Petitioner

United States District Court
For the Northern District of California

to identify, in his traverse, "the disputed issues of material
fact and his evidence on those issues."  July 12, 2010 Order,
Docket No. 304 at 2.  In response, Petitioner stated that, because
"Respondent's Answer to the Amended Petition . . . does not
indicate which facts asserted by Mr. Rodrigues are deemed true,
and which are denied, other than a general denial," he "cannot in
this Traverse identify the factual disputes, paragraph by
paragraph, and deny those factual assertions presented in the
Answer with which he disagrees."  Traverse, Docket No. 348 at 1-2.
Instead, Petitioner claims that it "appears from the Answer that
Respondent admits all the factual allegations in the Amended
Petition.  In that circumstance, the court may grant relief
without a hearing."  Id. at 2.  Respondent disputes this claim,
arguing that in his Answer he stated: "Except to the extent
expressly admitted herein, respondent denies each and every
material fact and legal characterization set forth in the
petition."  Respondent's Opp., Docket No. 354 at 17.  In its
discussion of each issue below, the Court analyzes whether any
material facts appear to be disputed and, if so, considers whether
Petitioner would be entitled to relief if the facts he alleges
were true.  In sum, the Court does not find any such disputed
material facts.  The Court also considers the justifications
offered for Petitioner's discovery requests regarding the specific
claims.

A.   Claim one: tried while incompetent

Petitioner argues that he was tried while mentally
incompetent.  He does not seek discovery, but he does seek an
evidentiary hearing, with regard to this claim.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

A criminal defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." Godinez v. Moran, 509 U.S. 389, 396 (1993); see also Deere v. Cullen, 718 F.3d 1124, 1144 (9th Cir. 2013); Douglas v. Woodford, 316 F.3d 1079, 1094 (9th Cir. 2003). The question "is not whether mental illness substantially affects a decision, but whether a mental disease, disorder or defect substantially affects the prisoner's capacity to appreciate his options and make a rational choice among them." Dennis ex rel. Butko v. Budge, 378 F.3d 880, 890 (9th Cir. 2004) (emphasis in original). A state court's finding of competency to stand trial is presumed correct if fairly supported by the record. Deere, 718 F.3d at 1145. No formal evidentiary hearing in state court is required for the presumption to apply. Id. (citing Sumner v. Mata, 449 U.S. 539, 545-47 (1981)). Petitioner must come forward with clear and convincing evidence to rebut the presumption. Deere, 718 F.3d at 1145.

          1.   Evidentiary hearing

Petitioner seeks an evidentiary hearing with regard to this claim "[t]o the extent any facts are disputed." Traverse at 24; see 28 U.S.C. § 2254(e)(2). His claim relies on declarations of several family members, acquaintances and medical professionals to support his contentions that he was mentally impaired for most of his life and was legally incompetent during the 1987 and 1988 pretrial and trial proceedings at issue. These declarations were first presented to the state court in his 1994 state habeas petition, six years after his trial and conviction. Petitioner

argues that the California Supreme Court, when confronted with these facts, unreasonably denied the claim; the Supreme Court did not accept the facts as true and, if Respondent disputed any of those facts, it was unreasonable for that court to deny the claim without the benefit of an evidentiary hearing.

On direct appeal, the California Supreme Court had rejected Petitioner's claim that the trial court should have ordered a competency hearing, because the trial "record d[id] not demonstrate a substantial doubt as to [Petitioner's] competency." Rodrigues, 8 Cal. 4th at 1112.   Respondent relies solely on this finding to support his argument that Petitioner's claim of actual incompetency, later raised on habeas, should be rejected. However, on appeal, the California Supreme Court did not address whether Petitioner was actually incompetent at the time of his trial; it only addressed whether the trial court was unreasonable for not holding a competency hearing based on the evidence presented before trial.

All of the evidence Petitioner brings to bear with regard to this claim was presented to the California Supreme Court, no contrary evidence was presented to that court, and there are no issues of disputed facts identified by either Petitioner or Respondent.   Furthermore, as discussed below, the claim is without merit.   Because the Court finds that this claim fails on its merits, even if all of Petitioner's facts are accepted as true, there is no need for an evidentiary hearing.   See Sully, 725 F.3d at 1075.   Accordingly, Petitioner's request for an evidentiary hearing on this claim is DENIED.

//

2.   Merits

Seven of the declarations Petitioner relies on are from doctors and social workers who detail the abuse he suffered as a child, his intellectual challenges in school, his history of debilitating headaches, and his drug abuse.  In addition, he relies on twenty-two declarations from childhood friends, girlfriends and family members that detail his childhood abuse, his headaches, and his drug use.

Of these declarations, only those of Dr. R.K. McKinzey, Ex. 164, App. 10; Dr. Alfred W. Fricke, Ex. 165, App. 44; and Dr. James R. Missett, Ex. 165, App. 42, state an expert opinion as to Petitioner's competence at the time of his trial based on their contemporaneous examinations of and discussions with him.  The remaining declarations (1) do not directly address Petitioner's competence at the time of his trial; (2) do not provide an opinion as to Petitioner's competence at the time of his trial and are based on examinations done several years after his trial; or (3) give a non-expert opinion on Petitioner's functioning at the time of his trial.  "Belated opinions of mental health experts are of dubious probative value and therefore, disfavored." Deere v. Woodford, 339 F.3d 1084, 1086 (9th Cir. 2003).  Thus, the Court focuses its analysis on the opinions of the three mental health experts who examined Petitioner around the time of his trial in 1987 and 1988.

On June 22, 1987, prior to being evaluated by a mental health expert, Petitioner appeared in municipal court for his preliminary hearing.  The municipal court judge held an in camera hearing during which Petitioner's counsel told the judge that Petitioner

32

refused to waive time for the preliminary hearing even though counsel needed more time to prepare for the hearing.  After speaking with the municipal court judge, Petitioner agreed to waive time.

Sometime in September 1987, one of Petitioner's attorneys contacted Dr. Fricke, a licensed psychologist, to examine him. Dr. Fricke interviewed Petitioner.  In his 1994 declaration, Dr. Fricke stated that Petitioner "seemed of limited intelligence" and that based on his review of Petitioner's medical and corrections records that were available to him around the time of Petitioner's trial and based on his interview of Petitioner, he believed that Petitioner "had some neurological dysfunction."  Ex. 165, App. 44, Fricke Dec. at 1.  He also opined that, based on his testing, Petitioner had a full scale IQ of 71.  However, Dr. Fricke conceded that his role in Petitioner's case was "relatively minor" and that he did not perform a competency examination or any neuropsychological testing.  Id.

On September 11, 1987, the superior court held an in camera hearing.  Petitioner had refused to waive time for his trial and refused to consent to counsel obtaining his medical records.  At that hearing, Petitioner's counsel informed the judge that he had consulted with Drs. Missett and McKinzey, who opined that they needed the medical records as they were important for a psychiatric defense.

Dr. Missett was retained by Petitioner's trial counsel in 1987.  He interviewed Petitioner twice in 1987 and reviewed police reports and some of Petitioner's medical and family history

records.  Dr. Missett never testified as to his opinion with regard to Petitioner's competency.

However, in his 1994 declaration, Dr. Missett stated that based on his 1987 interview he believed Petitioner to be "intellectually limited."  Ex. 165, App. 42, Missett Dec. at 2.  "Based upon the little information which I possessed at the time and my observations of [Petitioner] during our interview, I determined that [Petitioner] may have been suffering from organic brain damage and epilepsy."  Id.  Dr. Missett conceded that he informed Petitioner's trial counsel that "until more testing was done and more history was obtained, it was impossible to be certain whether or not [Petitioner] was competent to stand trial."  Id. at 3.  Nonetheless, he declared that had he known at the time of Petitioner's trial in 1987 of the information he later learned in 1994, he was "certain that with the new information" he would have found that Petitioner "was incompetent to stand trial and so informed" trial counsel.  Id. at 7.

Dr. Missett's declaration is unpersuasive.  Even though his two interviews with Petitioner led him to conclude in 1987 that Petitioner was "intellectually limited," he did not then opine that Petitioner was unable to consult and cooperate with his lawyer or that he was unable understand the charges against him or the trial proceedings.  Dr. Missett's current opinion that defense counsel should have raised an incompetency plea is a legal conclusion, not a medical opinion.[2]

---

[2] Whether defense counsel was ineffective based on failure to request an incompetency hearing is addressed in claim three.

Petitioner's trial counsel also retained Dr. McKinzey to render an opinion on Petitioner's competency to stand trial in 1987.  In his 1994 declaration, Dr. McKinzey stated that, based on his discussions with trial counsel and a review of Petitioner's police records, he "suspected severe physical abuse in childhood" and requested more documentation.  Ex. 164, App. 10, McKinzey Dec. at 2.  He went on to state that, on September 11, 1987, during the in camera hearing in Superior Court, he told the judge that Petitioner "was a high risk for neurological impairment which would make it difficult for him to cooperate with his defense counsel."  Id.  However, at that time, he had not yet interviewed Petitioner.  In his 1994 declaration, he states that he subsequently interviewed Petitioner, but it is not clear when that interview occurred.  In his 1994 declaration, Dr. McKinzey stated that he believed in 1987 that Petitioner "was able to understand the charges only marginally"; "had no idea of the roles of court personnel"; had impaired "ability to distinguish between defense and prosecution experts and investigators"; and "would be unable to effectively challenge witnesses, assist his counsel in challenging them, or point out or counteract inaccuracies in witnesses' statements."  McKinzey Dec. at 4-5.

However, Petitioner's behavior and apparent understanding of the proceedings as captured in the record of the 1987 pre-trial hearings, and his eventual cooperation with his counsel, casts doubt on Dr. McKinzey's conclusion.

While defense counsel's opinion of a defendant's competency is not enough to settle the question of competency, see Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991), the Ninth Circuit has

identified defense counsel's opinion of a defendant's competency to be "especially relevant." Williams v. Woodford, 384 F.3d 567, 608 (9th Cir. 2002) (citing Medina v. California, 505 U.S. 437, 450 (1992) ("defense counsel will often have the best-informed view of the defendant's ability to participate in his defense") and Hernandez, 930 F.2d at 718 (the fact that defense counsel considered defendant competent to stand trial was significant evidence that defendant was competent)). Petitioner's trial counsel's initial competency-related concerns were based on Petitioner's refusal to waive time and his failure to communicate rationally about that issue. Counsel believed that Petitioner was not competent to proceed to the preliminary hearing. The preliminary hearing judge was not swayed by that argument, and continued the proceeding to give Petitioner more time to gain a thorough understanding of what he was being asked to do and why. In a later proceeding, defense counsel stated that Petitioner was cooperating. The preliminary hearing judge then asked counsel whether Petitioner's competency was still an issue that needed to be addressed, to which counsel answered no. The transcript does not indicate at any other time that counsel raised any concerns about Petitioner's competency.

Furthermore, the transcript shows that the superior court judge was able to communicate rationally with Petitioner. The judge specifically stated that he believed Petitioner understood everything that was being said to him. September 11, 1987 Pre-Trial Hearing Transcript, Ex. 13 at 25:7-8. Petitioner eventually stated that he wanted to waive time because his lawyers had not

United States District Court
For the Northern District of California

had enough time to investigate properly.  September 15, 1987 Pre-Trial Hearing Transcript, Ex. 14 at 4:25-26.

On balance, the Court concludes that the California Supreme Court's decision that Petitioner was not incompetent at the time of his trial was not a result "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law," and was not "based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d). Even accepting all of Petitioner's facts as true, he has not presented "clear and convincing" evidence to rebut the presumption that he was competent to stand trial.  Accordingly, the petition's claim for relief on the ground that Petitioner was tried while incompetent is DENIED.

However, because the Court finds that Petitioner has demonstrated that other reasonable jurists might find this Court's assessment of the constitutional claim "debatable or wrong," Slack v. McDaniel, 529 U.S. 473, 484 (2000), Petitioner is granted a certificate of appealability (COA) pursuant to 28 U.S.C. § 2253(c) as to this claim.  See Hiivala v. Wood, 195 F.3d 1098, 1103 (9th Cir. 1999) (holding that appellate review is limited to the issues for which COAs are granted).

    B.   Claim two: trial court failed to hold a competency
         hearing

Petitioner argues that the trial court was unreasonable for failing to hold a competency hearing before his trial in light of substantial evidence that gave rise to a reasonable doubt about Petitioner's mental competency.  He does not seek discovery or an evidentiary hearing with regard to this claim.

United States District Court
For the Northern District of California

Due process requires a trial court to conduct a competency hearing <u>sua sponte</u> if the court has a good faith doubt concerning the defendant's competence.  <u>Pate v. Robinson</u>, 383 U.S. 375, 385 (1966).  A good faith doubt about a defendant's competence arises if "'a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'"  <u>Maxwell v. Roe</u>, 606 F.3d 561, 568 (9th Cir. 2010) (quoting <u>deKaplany v. Enomoto</u>, 540 F.2d 975, 983 (9th Cir. 1976) (en banc)).  In California, the "trial court is required to conduct a competence hearing, <u>sua sponte</u> if necessary, whenever there is substantial evidence of mental incompetence . . . Substantial evidence for these purposes is evidence that raises a reasonable doubt on the issue."  <u>People v. Howard</u>, 1 Cal. 4th 1132, 1163 (1992).  Several factors are relevant to determining whether a hearing is necessary, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial," but "even one of these factors standing alone may, in some circumstances, be sufficient."  <u>Drope v. Missouri</u>, 420 U.S. 162, 180 (1975).

On direct appeal, the California Supreme Court discussed in detail the trial court's determination that it did not need to hold a competency hearing.  <u>See</u> <u>Rodrigues</u>, 8 Cal. 4th at 1107-12. The high court concluded that the evidence did not raise a "substantial doubt" about Petitioner's competency, which would have triggered an obligation to hold a competency hearing.  <u>Id.</u> at 1112.  It reasoned that any doubt as to Petitioner's competency was based largely on his trial counsel's concerns about

Petitioner's unwillingness to waive time, sign medical release forms and speak with the defense's doctors, but that "defense counsel did not further pursue the competency issue once defendant became cooperative." Id. It also characterized the defense's doctors' findings as presented to the trial judge before Petitioner's trial as tentative, inconclusive and without particularity. Id. at 1110. Finally, it reasoned that defense counsel's opinion that Petitioner might have been incompetent was not enough, by itself, to trigger an obligation to hold a competency hearing sua sponte. Id. at 1112. Thus, the California Supreme Court concluded that it could not "say as a matter of law that the evidence raised a substantial doubt as to [Petitioner's] mental competence. Accordingly, the lower courts were under no duty to order a competency hearing." Id.

Even if a defendant is in fact incompetent, a trial court does not err in failing to hold a competency hearing if the record evidence does not call for it. See Stanley v. Cullen, 633 F.3d 852, 860-61 (9th Cir. 2011). The facts in this case are analogous to those in Stanley. There, the Ninth Circuit found that it was not unreasonable for the trial court to conclude there was not enough evidence before it to raise a doubt about the defendant's competence such that it should have held a hearing sua sponte. On one hand, the defendant made some questionable choices in strategy and acted oddly but, on the other hand, defense counsel specifically informed the trial court several times that they had no doubt about the defendant's competency to assist them. In addition, the defendant was coherent in his testimony and colloquies with the court, the trial judge who interacted with him

United States District Court
For the Northern District of California

1  during the guilt phase of his trial indicated his demeanor in

2  courtroom did not raise a doubt about his competency, and the

3  trial court had very little clinical or psychiatric evidence

4  regarding the defendant's mental health history.   Likewise, it was

5  not unreasonable for the California Supreme Court to conclude that

6  the trial judge in Petitioner's case did not err in failing to

7  hold a competency hearing <u>sua sponte</u>.   In coming to this

8  conclusion, the California Supreme Court considered the

9  transcripts of the pre-trial hearings, including Dr. McKinzey's

10 preliminary conclusion that he believed that Petitioner may have

11 had a neurological impairment.   It also considered defense

12 counsel's decision not to pursue the competency issue once

13 Petitioner became cooperative.

14      As discussed above, the California Supreme Court denied this

15 claim on the merits.   The record supports its conclusion that the

16 trial court was not obliged to hold a competency hearing <u>sua</u>

17 <u>sponte</u>.   Thus, Petitioner has not shown that the state court's

18 decision was "contrary to, or involved an unreasonable application

19 of, clearly established Federal law" or that it "resulted in a

20 decision that was based on an unreasonable determination of the

21 facts in light of the evidence presented" to it.   28 U.S.C.

22 § 2254(d).   Accordingly, the petition's claim for relief on the

23 ground that the trial court was required, but failed, to hold a

24 competency hearing at the time of Petitioner's trial is DENIED.

25      C.   Claim three: trial counsel was ineffective for failing
              to seek a competency hearing

26

27      Petitioner argues that trial counsel was deficient for

28 failing to investigate and present evidence that he was mentally

40

incompetent and for failing to request a competency hearing.  He does not seek discovery, but he does seek an evidentiary hearing with regard to this claim.

In order to prevail on a Sixth Amendment claim of ineffectiveness of trial counsel, Petitioner must establish two things.  First, he must show that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a "probability sufficient to undermine confidence in the outcome."  Id.

"Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  See id. at 689.  "Although courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.  There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  Harrington, 562 U.S. at 109 (citations omitted).  Petitioner has the burden of showing through evidentiary proof that trial counsel's performance was deficient.

See Toomey v. Bunnell, 898 F.2d 741, 743 (9th Cir. 1990); see also Rios v. Rocha, 299 F.3d 796, 813 n.23 (9th Cir. 2002) (rejecting two ineffective assistance of counsel claims based on petitioner's failure to produce evidence of prejudice). It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong. See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

Generally, unless a petitioner alleges an ineffective assistance of counsel claim of such magnitude that prejudice is presumed under United States v. Cronic, 466 U.S. 648, 659 n.26 (1984), he must point to specific errors of counsel. Id.; Young v. Runnels, 435 F.3d 1038, 1042-43 (9th Cir. 2006). A difference of opinion as to trial tactics does not constitute denial of effective assistance. See United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981). Further, tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984). The Supreme Court has never required defense counsel to pursue every nonfrivolous claim or defense, regardless of its merit, viability or realistic chance of success. Knowles v. Mirzayance, 556 U.S. 111, 125, 127 (2009).

A petitioner must also show that trial counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by Petitioner as the

result of the alleged deficiencies.  See id. at 697; Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995).

Furthermore, under AEDPA, the state court's determination of an ineffective assistance of counsel claim is afforded additional deference:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." . . .  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

Harrington, 562 U.S. at 101 (emphasis in original).

### 1.   Evidentiary hearing

Petitioner seeks an evidentiary hearing where trial counsel can be questioned as to his reasons for failing to request a competency hearing.  See 28 U.S.C. § 2254(e)(2).  However, as discussed below, this claim fails on its merits.  Thus, even if Petitioner's facts are accepted as true, there is no need for an evidentiary hearing.  See Sully, 725 F.3d at 1075.  Accordingly, Petitioner's request for an evidentiary hearing on this claim is DENIED.

### 2.   Merits

Petitioner claims that counsel "failed to press for suspension of criminal proceedings and institution of competence proceedings, despite their knowledge that Petitioner lacked a

United States District Court
For the Northern District of California

43

rational understanding of the proceedings and an ability to assist counsel rationally." Amended Petition (hereafter Am. Pet.) at 26. Petitioner relies on the same evidence he submitted to support claims one and two. Ineffective assistance of counsel exists for failure to move for a competency hearing when "there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered." Stanley, 633 F.3d at 862 (quoting Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001).

As discussed above with respect to claim one, even if the Court were to accept all of Petitioner's facts as true, he has not presented clear and convincing evidence of his incompetence to stand trial. Thus, even if his trial counsel performed deficiently in failing to request a hearing, Petitioner was not prejudiced by that decision. There is no "reasonable probability" that if trial counsel had requested a competency hearing, and one had been held, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Accordingly, the record supports the state court's conclusion that Petitioner's trial counsel was not ineffective for failure to request a competency hearing. Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it. 28 U.S.C. § 2254(d). Accordingly, the petition's claim for

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

relief on the ground that trial counsel was ineffective for

failing to request a competency hearing is DENIED.

However, the Court GRANTS a COA on this claim.

D.   Claim four: juror misconduct

Petitioner alleges two instances of juror misconduct, both of

which he claims are evidence of juror bias.  First, he argues that

one juror was untruthful in her responses to the juror

questionnaire and that her omission evidenced bias towards those

involved in drug violence.  Second, he claims that another juror

slept during the guilt phase of the trial and refused to

deliberate, and may have made up her mind before the end of the

guilt phase, depriving him of his constitutional right to a trial

by twelve impartial jurors.  Petitioner seeks both discovery and

an evidentiary hearing for this claim.

"The Sixth Amendment guarantees criminal defendants a verdict

by impartial, indifferent jurors.  The bias or prejudice of even a

single juror" would violate a defendant's right to a fair trial.

Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998).

These claims are procedurally barred as untimely.[3]  Even if

they were not procedurally barred, they are without merit, as

discussed below.  For this reason, no exception to the procedural

bar applies; Petitioner has not demonstrated prejudice, see Frady,

_____

[3] Although the California Supreme Court initially denied this
claim on the merits, Petitioner's second habeas petition's
untimeliness renders this claim procedurally barred.  See Harris
v. Reed, 489 U.S. 255, 263 (1989) (stating that a procedural bar
comes from "the last state court rendering a judgment in the
case").

456 U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

1. Facts regarding Juror Langston

On her voir dire questionnaire, Juror Langston answered no to several questions with regard to her and her family's experiences with crime. See Ex. 166, App. 69. Specifically, she denied that she or anyone close to her had ever been a victim of a crime, that anyone in her family had ever been accused of a crime, and that she knew anyone who abused drugs or had a drinking problem. When asked about "Brother's and sister's occupation," she omitted that she had brothers. She also stated that she believed "drugs" were "the most important causes of crimes," and that "the crime problem has increased in recent years" because of "drugs."

In a 1998 declaration, however, Juror Langston admitted that, as of the time of Petitioner's trial, she was "familiar with how people acted under the influence of drugs because a number of [her] brothers were drug users." Ex. 186 at Ex. 78. She stated that she was "close" to her brothers because she "helped raise them." Id. Two of her brothers had been in prison. She also admitted that one of her brothers "who was involved with drugs was killed on a street corner in [her] community" in 1977, id., a street corner near where this murder was committed. She had been in close communication with that brother a week before and two days before his death. She believed his death had to do with drugs or money. Lastly, she revealed that she had been the direct victim of a burglary in 1964. Petitioner argues that her misstatements constitute evidence of bias.

//

United States District Court
For the Northern District of California

2.    Discovery regarding Juror Langston

Petitioner asks for a "(1) subpoena of the prosecutorial files for information on Juror Langston and her brothers; and (2) subpoenas of the Menlo Park Police Department, Palo Alto and East Palo Alto Police Departments, and the Santa Clara Sheriff, of information on Langston's three brothers."  Traverse at 55.  He also asks to depose Juror Langston about the reason she answered the questionnaire dishonestly and "the closeness of the relationship to her brothers."  Id.

This Court has already denied Petitioner's first two requests.  Petitioner had failed to provide good cause for subpoenas of this information; rather he vaguely declared that the information gleaned from the records would be "relevant" to his claims.  His current requests for subpoenas continue to suffer from this defect.  As discussed below, even accepting as true that Juror Langston's brothers were involved in drug crimes and had spent time in prison, Petitioner's claim would still fail.  Petitioner does not state what additional essential information is in the records he seeks.  Accordingly, Petitioner's subpoena requests with respect to this claim are DENIED.

Petitioner's request for a deposition of Juror Langston is also denied.[4]  Petitioner does not state that he pursued this discovery in state court; if he did not, his failure demonstrates a lack of due diligence.  He also does not state that he asked Juror Langston the reasons for her omissions at the time he

_____

[4] Apparently it is also moot; counsel has informed the Court that Juror Langston has passed away.

47

obtained her declaration as to the incorrect answers.  If he did
not, he does not state why he did not do so.  If he did, he does
not state what she said in response.  Lastly, Petitioner's trial
was twenty-seven years ago, and he has known that Juror Langston's
answers were incorrect for the past seventeen years.  He does not
explain why he has not obtained this information.  Petitioner has
not established that he was diligent in pursuing the factual
predicate for this claim.  Accordingly, Petitioner's request to
depose Juror Langston is DENIED.  See Williams, 529 U.S. at 437.

> 3.   Evidentiary hearing regarding Juror Langston

Petitioner's request for an evidentiary hearing is moot
because Juror Langston is dead.  Furthermore, Petitioner does not
establish that he sought a hearing in state court.  See 28 U.S.C.
2254(e)(2).  Accordingly, Petitioner's request for an evidentiary
hearing on this claim is DENIED.

> 4.   Merits regarding Juror Langston

Petitioner argues that Juror Langston's dishonesty during
voir dire "precluded [him] from exploring her potential bias
stemming from these experiences and from developing a potential
challenge for cause."  Am. Pet. at 30.

The Ninth Circuit explained the importance of voir dire as
follows:

> One important mechanism for ensuring impartiality is voir
> dire, which enables the parties to probe potential jurors for
> prejudice.  For voir dire to function, jurors must answer
> questions truthfully.  Nevertheless, we must be tolerant, as
> jurors may forget incidents long buried in their minds,
> misunderstand a question or bend the truth a bit to avoid
> embarrassment.  The Supreme Court has held that an honest yet
> mistaken answer to a voir dire question rarely amounts to a
> constitutional violation; even an intentionally dishonest
> answer is not fatal, so long as the falsehood does not
> bespeak a lack of impartiality.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    _Dyer_, 151 F.3d at 973.

2        The Ninth Circuit recognizes three forms of juror bias:

3    actual bias, implied bias and "_McDonough_-style bias."  United

4    States v. Olsen, 704 F.3d 1172, 1189 (9th Cir. 2013) (citing

5    McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554-56

6    (1984)).  A habeas petitioner cannot obtain relief on an implied

7    bias claim because the Supreme Court has never explicitly adopted

8    or rejected the doctrine of implied bias.  _Hedlund v. Ryan_, 815

9    F.3d 1233, 1248-49 (9th Cir. 2016).[5]

10       Actual bias "stems from a pre-set disposition not to decide

11   an issue impartially."  _Olsen_, 704 F.3d at 1189.  To prove

12   _McDonough_-style bias, "a party must first demonstrate that a juror

13   failed to answer honestly a material question on _voir dire_, and

14   then further show that a correct response would have provided a

15   valid basis for a challenge for cause."  _McDonough_, 464 U.S. at

16   556.  "The motives for concealing information may vary, but only

17   those reasons that affect a juror's impartiality can truly be said

18   to affect the fairness of a trial."  _Id._; _see also_ _Sanders v._

19   _Lamarque_, 357 F.3d 943, 949 (9th Cir. 2004) (using this standard

20   under AEDPA).

21

22

23       [5] The Ninth Circuit's conclusion in _Hedlund_ appears difficult
24   to reconcile with its pre-AEDPA en banc opinion on implied bias,
     _Dyer_.  151 F.3d at 985 n.24 ("Courts disagree . . . about when the
25   doctrine applies, not whether it exists.").  _See_ _Conaway v. Polk_,
     453 F.3d 567, 586-88 (4th Cir. 2006) (concluding in post-AEDPA
26   opinion that the "doctrine of implied bias remains," while heavily
     quoting _Dyer_); _Brooks v. Dretke_, 444 F.3d 328, 329-32 & n.5 (5th
27   Cir. 2006) (concluding that implied bias is clearly established
     federal law under AEDPA, citing _Dyer_).
28

Respondent concedes that Juror Langston's 1988 voir dire questionnaire and her 1998 declaration were contradictory.  He argues, however, that because both were executed under penalty of perjury, "[f]aced with the conflicting evidence, the California Supreme Court reasonably could conclude that the juror questionnaire, filled out before the trial and verdict, and before any doubts about the verdict, aided by defense investigators, may have set in, was the more credible."  Answer at 35.

This Court finds Respondent's argument implausible and assumes that Juror Langston did not fabricate the stories about her brother after the trial.  Nor is it plausible that she forgot about her brothers.  This case involved drug dealing and murder, and Juror Langston's brothers, to whom she admitted she was close, were drug abusers and had spent time in prison for drug-related crimes.  She believed that one of her brothers was murdered over drugs or money, and the scene of this crime was very close to where her brother was killed.  She omitted not only the circumstances of her brothers' criminal histories and the facts surrounding one brother's death, but also the fact that she even had brothers.

However, Petitioner still fails to meet his burden to establish that Juror Langston was actually biased or biased under McDonough.  As discussed above, Petitioner did not diligently pursue the facts that might prove his claim.  Petitioner has not developed facts demonstrating that Juror Langston was pre-disposed not to decide his case impartially or that her motives for concealing information about her brothers affected her

United States District Court
For the Northern District of California

impartiality.   The petition's claim for relief on the ground that Juror Langston was actually biased is DENIED.

However, the Court GRANTS a COA on this claim.

### 5.   Facts regarding Juror Bourdelais

Petitioner claims that Juror Bourdelais's "actions of sleeping through the guilt phase of the trial and refusing to deliberate deprived [him] of his constitutional right to a trial by twelve impartial jurors."  Am. Pet. at 34.

During the penalty phase of the trial, but before penalty deliberations had begun, Juror Leddy asked to speak to the judge with regard to Juror Bourdelais.  Juror Leddy stated that he overheard Juror Bourdelais complain that she did not want to listen to more witnesses during the penalty phase because she had already made up her mind.  Ex. 133 at RT 13372.  The court held a hearing at which Juror Bourdelais admitted that, after the guilty verdict and prior to the penalty phase deliberations, she had already made up her mind about the penalty.  Ex. 134 at RT 13415-23.  The judge noted that it appeared that Juror Bourdelais slept during the guilt phase of the trial, and seemed inattentive.  When questioned by the trial judge, Juror Bourdelais stated that she "heard everything that's gone on."  Ex. 134 at RT 13416.  Based on Juror Bourdelais's admission that she had prematurely made up her mind as to Petitioner's penalty, the trial judge excused her from the penalty phase deliberations.  Ex. 134 at RT 13422-23.

At the same hearing, Petitioner's lawyers suggested that perhaps Juror Bourdelais had also made up her mind before the guilt phase deliberations.  This suggestion was based on a note from the jury during the guilt phase deliberations stating that an

**United States District Court**
For the Northern District of California

unnamed juror had already made up his or her mind and refused to deliberate.  Ex. 134 at RT 13418-19.  It does not appear that the trial judge investigated the note at the time it was given to him. Nevertheless, at the hearing regarding Juror Bourdelais, the trial judge explicitly refused to inquire further about that note.

Petitioner concedes that Juror Bourdelais was properly excused from the penalty phase deliberations when the trial court found that she had violated her oath to stay impartial during the penalty phase.  However, he argues, her sleeping during the guilt phase, as well as his speculation that she was the juror who refused to participate in the guilt phase deliberations, may be evidence that she was biased during the guilt phase as well.

6.   Discovery regarding Juror Bourdelais

Petitioner seeks to depose Juror Bourdelais and Juror Leddy to determine whether Juror Bourdelais made comments regarding her bias and, if so, when.  As discussed below, Petitioner has not established good cause for his request, nor has he established that he was unable to obtain this evidence despite due diligence. Accordingly, his request to depose Jurors Bourdelais and Leddy is DENIED.  See Williams, 529 U.S. at 437.

7.   Evidentiary hearing regarding Juror Bourdelais

As discussed below, the claim fails on its merits. Accordingly, there is no need for an evidentiary hearing.  Thus, Petitioner's request for an evidentiary hearing on this claim is DENIED.  See Sully, 725 F.3d at 1075; 28 U.S.C. § 2254(e)(2).

8.   Merits regarding Juror Bourdelais

Juror Bourdelais's sleeping does not merit granting habeas relief.  "Inattentiveness can be a form of juror misconduct and

may constitute cause to discharge a juror.  However inattentiveness is not, _per se_, a violation of a criminal defendant's right to due process, a fair trial, or an impartial jury."  Morales v. Sisto, 2012 WL 3791395, at *22 (N.D. Cal.) (citing Tanner v. United States, 483 U.S. 107, 126-27 (1987)).  The Ninth Circuit has explained that "the presence of all awake jurors throughout an entire trial is not an absolute prerequisite to a criminal trial's ability to 'reliably serve its function as a vehicle for determination of guilt or innocence.'"  United States v. Olano, 62 F.3d 1180, 1189 (9th Cir. 1995) (citing United States v. Springfield, 829 F.2d 860, 864 (9th Cir. 1987)).  Similarly, "the presence of a sleeping juror during trial does not, _per se_, deprive a defendant of a fair trial."  Id.

Similarly, Petitioner's assertion that Juror Bourdelais was the juror who refused to deliberate during the guilt phase is unsupported.  A trial court confronted with a colorable claim of juror bias will generally conduct a hearing involving all interested parties to explore the issue of juror bias and provide the defendant an opportunity to prove actual bias.  Hedlund, 815 F.3d at 1246; see also Smith v. Phillips, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing [by the trial court] in which the defendant has the opportunity to prove actual bias").  So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.  See Hedlund, 815 F.3d at 1246-48 (state supreme court's decision that trial court did not abuse its discretion in refusing to dismiss a

United States District Court
For the Northern District of California

juror who discovered she was distantly related to victim was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, where trial court held hearing and was reasonably satisfied that no actual bias was present).

Here, Juror Bourdelais's responses during the hearing do not indicate that she had also made up her mind prior to the beginning of the guilt phase deliberations; she spoke about how she needed to hear everything because the other jurors' ideas may make her change her own ideas. See Ex. 134 at RT 13417-18.

Thus, Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it. 28 U.S.C. § 2254(d). Accordingly, the petition's claim for relief on the ground that Juror Bourdelais committed misconduct by inattentiveness or was biased during the guilt phase is DENIED.

E.   Claim five: bias in jury selection

Petitioner asserts three claims of bias in the jury selection: (1) that his jury was drawn from an unfair cross-section of the community, violating his Sixth Amendment right to a fair and impartial jury; (2) that the systematic exclusion of Hispanics from the jury pool violated his Fifth Amendment right to equal protection; and (3) that the prosecutor discriminated in his use of peremptory challenges, in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Petitioner seeks discovery and an evidentiary hearing on this claim.

**United States District Court**
For the Northern District of California

These claims are procedurally barred as untimely.  Even if they were not procedurally barred, they are without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, see Frady, 456 U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

        1.   Systematic underrepresentation of Hispanics at all stages of jury selection

A criminal defendant has a constitutional right stemming from the Sixth Amendment to a fair and impartial jury pool composed of a cross-section of the community.  See Holland v. Illinois, 493 U.S. 474, 480 (1990); Taylor v. Louisiana, 419 U.S. 522, 538 (1975).  The community is the jury-eligible population in the jurisdiction.  See United States v. Rodriguez-Lara, 421 F.3d 932, 943 (9th Cir. 2005), overruled on other grounds by United States v. Hernandez-Estrada, 749 F.3d 1154, 1164 (9th Cir. 2014) (en banc).  The "jury pool" refers to those in the "qualified jury wheel," meaning "the list of prospective jurors who have been randomly pulled from the juror source list, have been mailed juror questionnaires, have returned those questionnaires, and have been deemed qualified based on their response to those questionnaires."  Hernandez-Estrada, 749 F.3d at 1161.  The jury pool is different from the venire, the group of potential jurors called into the courtroom to be questioned for voir dire for the trial.  The fair cross-section requirement applies to the jury pool and the venire and is not applicable to the jury that is seated for a defendant's trial.  See Lockhart v. McCree, 476 U.S. 162, 173-74 (1986); Nevius v. Sumner, 852 F.2d 463, 466 (9th Cir. 1988).

United States District Court
For the Northern District of California

In Duren v. Missouri, the Supreme Court held that to establish a prima facie violation of the fair-cross-section requirement, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." 439 U.S. 357, 364 (1979). The first showing is easily made in most cases, while the second and third are more likely to generate controversy. Berghuis v. Smith, 559 U.S. 314, 319 (2010).

The Supreme Court has explained that, as to the second showing, "neither Duren nor any other decision of [the Supreme] Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." Id. at 329. The Ninth Circuit has regularly employed the absolute disparity test, which measures "the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool." Rodriguez-Lara, 421 F.3d at 943.[6] Although no bright-line rule exists as to what level of absolute disparity violates the Constitution, the Ninth Circuit has

---

[6] Rodriguez-Lara required the absolute disparity test. However, in Hernandez-Estrada, the Ninth Circuit, sitting en banc, overruled that requirement, explaining that "the appropriate test or tests to employ will largely depend on the particular circumstances of each case." 749 F.3d at 1164. The court held that "courts may use one or more of a variety of statistical methods to respond to the evidence presented." Id.

declined to find underrepresentation of a distinctive group where the absolute disparity was 7.7 percent or lower.  Hernandez-Estrada, 749 F.3d at 1164; see also United States v. Suttiswad, 696 F.2d 645, 649 (9th Cir. 1982); Thomas v. Borg, 159 F.3d 1147, 1151 (9th Cir. 1998) (collecting cases).  Further, because the 7.7 percent bar is not Supreme Court law, it is inapplicable on habeas.

As to the third prong regarding "systematic exclusion," there is no clearly established Supreme Court precedent supporting that a petitioner "can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation."  Berghuis, 559 U.S. at 332 (emphasis in original).  Further, the Court explained, it is not unreasonable for a state court to conclude that Duren requires a petitioner to show that the underrepresentation was due to systematic exclusion."  Id. at 333.

### a.   Discovery

Petitioner seeks discovery on this allegation.  He requests access to the records for the entire qualified jury pool for San Mateo County at the time of his trial.  Petitioner has not established good cause for his request because, as discussed below, even if the facts were fully developed, he would not be entitled to relief.  Furthermore, he has not established that he was unable to obtain this evidence despite due diligence.  Thus, his discovery request is DENIED.

### b.   Evidentiary hearing

As discussed below, this claim fails on its merits.  Accordingly, there is no need for an evidentiary hearing.  Thus,

Petitioner's request for an evidentiary hearing on this claim is DENIED.  See Sully, 725 F.3d at 1075; 28 U.S.C. § 2254(e)(2).

            c.    Merits

     In his Traverse, Petitioner relies on the absolute disparity test to contend that Hispanics were systematically underrepresented in the jury pool for San Mateo County at the time of his trial.  He alleges that, according to the 1990 Census, Hispanics were 15.4 percent of the population, but he estimates that Hispanics comprised only eight percent of the jury pool. Thus, Petitioner claims that a conservative estimate of the absolute disparity for the Hispanic population at the time of his trial was 7.4 percent.  As explained above, the Supreme Court employs no strict percentage test.  Even if Ninth Circuit law did apply here, this disparity does not pass muster given that, even when it required the use of the absolute disparity test, the Ninth Circuit declined to find underrepresentation of the distinctive group when the absolute disparity was 7.7 percent or lower.

     Furthermore, while Petitioner claims that the 7.4 percent absolute disparity estimate is likely conservative, it is also possible that the figure overestimates the disparity.  Because he did not obtain access to the names and racial and ethnic identities of the entire jury pool from the time of his trial, Petitioner extrapolates data from the juror questionnaires (Exhibits 174-183) for the prospective jurors in his trial to derive his 7.4 percent estimate of the proportion of Hispanics in the entire jury pool.  Petitioner alleges that the jury commissioner originally called 362 jurors from the jury pool to comprise the venire for Petitioner's trial.  He claims that fifty-

nine of those jurors had Spanish surnames but he speculates that only thirty of those jurors were "actually" Hispanic due to the large number of Filipinos in San Mateo County at the time who had Spanish surnames.  Thus, he speculates that Hispanics comprised only eight percent of the venire for his trial and concludes that they comprised eight percent of the entire jury pool.[7]  However, Petitioner fails to account for the likelihood that there were Hispanic jurors in the jury pool who did not have Spanish surnames.

Even if Petitioner could satisfy the second prong of the Duren test, that the representation of Hispanics in the jury pool was not fair in relation to the number of Hispanics in San Mateo County at the time of his trial, he provides no evidence (other than references to a California Superior Court transcript in another trial) that any underrepresentation of Hispanics was due to "systematic exclusion of the group in the jury-selection process."  Hernandez-Estrada, 749 F.3d at 1165 (citing Duren, 439 U.S. at 364).  Petitioner speculates that the granting of transportation hardship excuses, county "quota" systems, failure to follow up with prospective jurors who did not return the questionnaire and the over-representation of non-returns in cities with high Hispanic populations contributed to the systematic

---

[7] Petitioner also alleges that, after hardship disqualifications, 184 jurors were in his venire and answered questionnaires specific to his trial.  Of the 184, Petitioner alleges that thirty-three had Spanish surnames, but that sixteen of those jurors self-identified as non-Hispanic.  Petitioner does not state how many of the jurors without Spanish surnames identified as Hispanic.

exclusion of Hispanics.  Petitioner has not cited any evidence of these practices or any precedential legal authority that any of these practices constitute sufficient evidence of systematic exclusion.  See <u>Berghuis</u>, 559 U.S. at 332.

Accordingly, the record supports the state court's denial of Petitioner's claim that Hispanics were systematically excluded from the jury pool.  Thus, Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  The petition's claim for relief on the ground that the jury pool did not represent a fair cross-section of the community is DENIED.

### 2.   Violation of equal protection

Petitioner also claims an equal protection violation due to the continued use of the same discriminatory jury selection mechanism he hypothesized to support his fair cross-section claim.

To establish a prima facie case of such a claim, Petitioner must

> (1) establish that the group, of which the [petitioner] is a
> member, is one that is a recognizable, distinct class,
> singled out for different treatment under the laws, as
> written or as applied; (2) prove the degree of
> underrepresentation by comparing the proportion of the group
> in the total population to the proportion called to serve as
> grand jurors, over a significant period of time; and
> (3) discriminatory intent.

<u>Hernandez-Estrada</u>, 749 F.3d at 1166 (quoting <u>United States v. Esquivel</u>, 88 F.3d 722, 725 (9th Cir. 1996)) (internal quotation marks omitted); <u>see also</u> <u>Castaneda v. Partida</u>, 430 U.S. 482, 494 (1977).  The "essential question of underrepresentation is the

same in both equal protection and fair cross-section challenges."
Hernandez-Estrada, 749 F.3d at 1166-67.

Hispanics are "a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." Hernandez-Estrada, 749 F.3d at 1166; see also Hernandez v. Texas, 347 U.S. 475 (1954) (concluding that "persons of Mexican descent" constitute such a class). However, as discussed above, the Supreme Court has not decided what degree of absolute disparity is constitutional. See Wheelock v. Kernan, 2012 WL 359750, at *27 (N.D. Cal.), aff'd, 571 Fed. App'x. 559 (9th Cir. 2014) (applying this reasoning on habeas to fair cross-section claim and equal protection claim). Further, Petitioner has not proven the degree of underrepresentation. Thus, his equal protection claim fails.

Furthermore, Petitioner must show discriminatory intent. See Castaneda, 430 U.S. at 494; Hernandez-Estrada, 749 F.3d at 1166; Thomas, 159 F.3d at 1150. Petitioner claims that, because "substantial underrepresentation has occurred," one can infer discriminatory intent. Traverse at 62. He is incorrect. He must allege facts to support his allegation of discriminatory intent. See Esquivel, 88 F.3d at 728 (rejecting the argument that "any substantial disparity over a period of time between a group's percentage on the jury and its percentage in the eligible population is prima facie evidence of discrimination, regardless of the source of jurors" (emphasis omitted)). He does not do so. Further, because there is no clearly established Supreme Court law on how to evaluate discriminatory intent, it was not contrary to, or an unreasonable application of, this body of law not to infer discriminatory intent.

United States District Court
For the Northern District of California

1    Thus, Petitioner has not shown that the state court's

2  decision was "contrary to, or involved an unreasonable application

3  of, clearly established Federal law" or that it "resulted in a

4  decision that was based on an unreasonable determination of the

5  facts in light of the evidence presented" to it.  28 U.S.C.

6  § 2254(d).  Accordingly, the petition's claim for relief on the

7  ground that the jury selection method violated Petitioner's right

8  to equal protection is DENIED.

9         3.   Discriminatory peremptory challenges

10    Petitioner alleges that the prosecutor used his peremptory

11 challenges systematically to exclude African-American and Hispanic

12 jurors in violation of Batson, 476 U.S. 79.  However, Petitioner

13 may not raise a Batson claim here because he failed to object at

14 trial to the prosecution's use of peremptory challenges.  See

15 Haney v. Adams, 641 F.3d 1168, 1169, 1173 (9th Cir. 2011).

16    In Haney, a petitioner alleged that the prosecutor used

17 peremptory challenges to remove all African-American potential

18 jurors.  Haney's trial counsel had not objected to the challenges.

19 On state habeas review, the state court rejected Haney's Batson

20 claim for relief for that reason.  On federal habeas review, the

21 district court also denied Haney's Batson claim, in part because

22 the claim was not raised at trial.  The Ninth Circuit upheld the

23 district court's decision.  It ruled that "the Supreme Court has

24 never allowed a Batson challenge to be raised on appeal or on

25 collateral attack, if no objection was made during jury

26 selection."  Id. at 1171.  Thus, it reasoned that the state

27 court's decision could not be "contrary to" clearly established

28 federal law.  Id.

**United States District Court**
For the Northern District of California

Furthermore, the Ninth Circuit stated that <u>Batson</u> itself "presupposes a timely objection." <u>Id.</u>  In <u>Batson</u>, the Supreme Court articulated a three-step process for evaluating potentially discriminatory use of peremptory challenges.  First, the defendant must make out a <u>prima facie</u> case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." <u>Batson</u>, 476 U.S. at 93-94.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  <u>Id.</u> at 97; <u>Wade v. Terhune</u>, 202 F.3d 1190, 1195 (9th Cir. 2000).  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  <u>Batson</u>, 476 U.S. at 98; <u>Wade</u>, 202 F.3d at 1195.  To fulfill its duty, the "court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1047 (9th Cir. 2004) (quoting <u>Lewis v. Lewis</u>, 321 F.3d 824, 831 (9th Cir. 2003)).  In light of these requirements, the Ninth Circuit reasoned that the determination of whether a peremptory strike was discriminatory depends heavily on the trial judge's own observations.  These determinations would "be difficult, if not impossible, to evaluate for the first time in post-conviction proceedings when no record is preserved," which would require the prosecution to reconstruct, years later, the reasons for the strikes.  <u>Haney</u>, 641 F.3d at 1172.  Thus, in <u>Haney</u>, the state court's decision was not "'an unreasonable

United States District Court
For the Northern District of California

application' of the law clearly established in <u>Batson</u>" because <u>Batson</u> presupposes an objection made at trial.  <u>Id.</u>  The same is true here.

Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  Accordingly, the petition's claim for relief on the ground of unconstitutional <u>Batson</u> violations is DENIED.

> F.   Claim nine: ineffective assistance of trial counsel during guilt phase

Petitioner raises eleven instances of ineffective assistance of trial counsel during the guilt phase of his trial.  He requests both discovery and an evidentiary hearing on this claim.  He also raises other ineffective assistance of counsel subclaims that relate to other claims, which do not overlap with his claim nine arguments.  The Court addresses each argument within the context in which it was raised.

As noted above, to prevail on a Sixth Amendment claim of ineffectiveness of trial counsel, Petitioner must establish that counsel's performance was deficient and that he was prejudiced by it.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88.

This claim is procedurally barred as untimely.  Even if it were not procedurally barred, it is without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, <u>see</u> <u>Frady</u>, 456

U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

### 1.   Discovery

Petitioner asks to depose trial counsel as to the reasons for several decisions made in the case.  As discussed below, Petitioner has not established good cause for his request, nor has he established that he was unable to obtain this evidence despite due diligence.  See Williams, 529 U.S. at 437.  Accordingly, his request to depose his trial counsel is DENIED.

### 2.   Evidentiary hearing

As discussed below, this claim fails on its merits. Accordingly, there is no need for an evidentiary hearing.  Thus, Petitioner's request for an evidentiary hearing on this claim is DENIED.  See Sully, 725 F.3d at 1075; 28 U.S.C. § 2254(e)(2).

### 3.   Merits

#### a.   Trial counsel failed to investigate and present overwhelming evidence that Petitioner was incompetent to stand trial

The substance of this claim is the same as that presented in claim three.  As discussed with respect to that claim, even accepting all of Petitioner's facts as true, he has not presented clear and convincing evidence of his incompetence to stand trial. Thus, even if his trial counsel's performance was deficient in failing to request a hearing, Petitioner was not prejudiced by that decision.  Accordingly, the petition's request for habeas relief for this allegation of ineffective assistance of trial counsel is DENIED.

However, the Court GRANTS a COA on this claim.

United States District Court
For the Northern District of California

b.   Trial counsel failed to litigate the state's destruction of evidence and seek appropriate sanctions

The substance of this claim is the same as that presented in claim fourteen. As discussed below with respect to that claim, even accepting all of Petitioner's facts as true, his claim of failure to preserve evidence of Mr. Zavala's cash and his own car is without merit. Thus, even if trial counsel's performance was deficient in failing to litigate this issue, Petitioner was not prejudiced by that decision. Accordingly, the petition's request for habeas relief for this allegation of ineffective assistance of trial counsel is DENIED.

c.   Trial counsel failed to investigate Petitioner's mental state at the time of the crime

Petitioner relies on the same allegations and evidence of mental impairment to argue both that he had an impaired mental state at the time of the crime and that he was incompetent to stand trial.

Petitioner has not established that he was legally insane at the time of the crime, which requires a finding by preponderance of the evidence that the defendant "was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed." See People v. Elmore, 59 Cal. 4th 121, 140 (2014) (citing Cal. Penal Code § 25(b)). Thus, even if trial counsel's performance was deficient in failing to investigate this issue and present an insanity defense, Petitioner was not prejudiced by that decision because he would not have been able to carry his burden of proof.

**United States District Court**
For the Northern District of California

1   Accordingly, the petition's request for habeas relief for this

2   allegation of ineffective assistance of trial counsel is DENIED.

3        d.   Trial counsel failed to request appropriate
             jury instructions on the relevance of drug and
4            alcohol intoxication to the mental state
             element of the offenses

5

6        Petitioner asserts that trial counsel was prejudicially

7   ineffective when he failed to request jury instructions on the

8   relevance of Petitioner's drug and alcohol use on his mental

9   culpability, despite ample evidence in the record on which to base

10  such a request.  In applying Strickland to failures to request

11  jury instructions, the Ninth Circuit distinguishes those failures

12  "based on 'a misunderstanding of the law'" from strategic

13  decisions "'to for[]go one defense in favor of another.'"  Crace

14  v. Herzog, 798 F.3d 840, 852 (9th Cir. 2015) (quoting United

15  States v. Span, 75 F.3d 1383, 1387 (9th Cir. 1996)).

16       Here, there was no basis to request such an instruction.

17  Petitioner did not testify in his own defense, so there is no

18  direct evidence from him as to his drug use that day.  Ms.

19  Ontiveros testified that she and co-perpetrator Mr. Garcia

20  injected heroin together, but made no mention of having shared it

21  with Petitioner.  Ex. 93 at RT 9843.  When Dr. Jamieson testified

22  regarding his notations in Petitioner's medical records prior to

23  surgery the following morning, he indicated that at no time while

24  Petitioner was at Highland Hospital did he appear to be under the

25  influence of any substance.  Ex. 104 at RT 10980.  Further,

26  counsel's decision was likely strategic because he chose to pursue

27  a wrongful identification defense over a mental state defense.

28

Accordingly, Petitioner has failed to meet his burden of showing that the state court's decision that counsel did not render ineffective assistance was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  The petition's request for habeas relief for this allegation of ineffective assistance of trial counsel is DENIED.

> e.  Trial counsel failed to present evidence that would undermine Mr. Zavala's testimony

The substance of this claim is the same as that presented in claims fourteen and twenty.  As discussed below with respect to those claims, even accepting all of Petitioner's facts as true, his claims of failure to present evidence of Mr. Zavala's alleged bias and of his missing cash are without merit.  Thus, even if trial counsel's performance was deficient in failing to litigate these issues, Petitioner was not prejudiced by that decision.  Accordingly, the petition's request for habeas relief for this allegation of ineffective assistance of trial counsel is DENIED.

> f.  Trial counsel failed to impeach adequately Ms. Vargas's identification

Petitioner argues that trial counsel rendered ineffective assistance by failing to introduce into evidence numerous reports in counsel's possession that contained inconsistent statements regarding Ms. Vargas's ability to see the perpetrators and the race of one of the individuals, whom she later identified as Petitioner.  These reports were submitted as Exhibits 166 and 168,

Appendices 68, 71, 89, 90, 91, 92, and 111.  The California
Supreme Court denied the claim on the merits.

This claim is without merit.  Appendix 90 is the bulletin
issued by the Santa Clara County Police Department and Appendix 91
is the police dispatch record for that evening.  The other
documents include reports by police officers who questioned Ms.
Vargas, about which Petitioner's counsel cross-examined her, and
her own direct statement, again the subject of counsel's cross-
examination.  The information contained in each document is
repetitive and cumulative.

Appendix 111, the statement of Detective Ronald Williams, was
prepared after the night of the events.  Both Detective Williams
and Ms. Vargas were cross-examined regarding that statement.

Petitioner has not shown that the state court's decision was
"contrary to, or involved an unreasonable application of, clearly
established Federal law" or that it "resulted in a decision that
was based on an unreasonable determination of the facts in light
of the evidence presented" to it.  28 U.S.C. § 2254(d).
Accordingly, the petition's request for habeas relief for this
allegation of ineffective assistance of trial counsel is DENIED.

> g.   Trial counsel failed to investigate and
>      present evidence to impeach Ms. Ontiveros's
>      testimony

Much of the substance of this claim relies on the same
evidence as that presented to support claim fifteen and the
arguments raised in claim twenty.  As discussed below with respect
to those claims, Petitioner has failed to show that the evidence
is credible or admissible.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Moreover, Petitioner has failed to show that he has suffered prejudice as a result of counsel's failure to procure and present the evidence he includes with his habeas petition.  On cross-examination, Petitioner's trial attorney got Ms. Ontiveros to admit to fifteen instances of lying to the police during the course of the investigation.  Ex. 92-93 at RT 9780-874.  Counsel was prepared to question her about more lies to the police, but the trial court sustained an objection to continued questioning because the point had been made.  Ex. 93 at RT 9876-77.

Petitioner's trial counsel also challenged Ms. Ontiveros's assertion that she had decided to tell the truth to the police because of her religious dedication.  During cross-examination, she admitted that she stopped going to church when she turned eighteen and that she did not attend services while using drugs.  Ex. 93 at RT 9835-36.  She also admitted that, when the police came to question her regarding the murder, they came with twenty SWAT team officers and surrounded the facility where she was staying as a part of probation.  Ex. 92 at RT 9786.  The police had a lengthy conversation with her and then arrested her for murder.  Ex. 92 at RT 9788.  She contacted the police to tell the truth after being transported to jail.  Ex. 93 at RT 9888.  One month after she told the police her version of events, she entered into a plea bargain dismissing all claims except conspiracy to commit robbery, to which she entered a nolo contendere plea, and received a four-year sentence that she served in a Mother-Infant program and county jail.  Ex. 92 at RT 9789-90.

Ms. Ontiveros acknowledged that, in her initial statement, she swore to God on her children that she was telling the truth

because she was trying to protect herself, Ex. 93 at RT 9878, yet she continuously lied to police.  She admitted that she was removed from the Mother-Infant program to which she had been sentenced initially and that her child was placed in Ms. Ontiveros's mother's care.  Ex. 92 at RT 9791.

Additionally, she admitted that she was in love with co-perpetrator Mr. Garcia at the time of the crime and remained so as of the time of Petitioner's trial.  Ex. 92 at RT 9719; Ex. 93 at 9829.  She explained her lies to the police as an attempt to protect Mr. Garcia.  Ex. 93 at RT 9874.

During trial, she discussed her extensive heroin and injectable cocaine use, her exchange of sex for drugs and money, and her "ripping off" her own heroin customers.  Ex. 92 at RT 9736, 9812; Ex. 93 at RT 9823.  Much of what Petitioner argues should have been explored with this witness was covered by trial counsel's cross-examination.  Some of what Petitioner seeks to introduce in the habeas proceeding would be cumulative or extraneous.

Petitioner argues that counsel failed to discover and present additional evidence pertaining to Ms. Ontiveros, namely (1) Ms. Ontiveros regularly robbed drug dealers at knife point, and (2) when she was arrested for robbery prior to being arrested for the instant crimes, she was admitted to jail with a black-handled knife, the same kind of knife used in the murder for which Petitioner was convicted.  The affidavit Petitioner submits does not substantiate his claim regarding Ms. Ontiveros's regular practice of robbing drug dealers with Mr. Garcia.  Ms. Ontiveros admitted planning the robbery and discussing it with Mr. Garcia

United States District Court
For the Northern District of California

and Petitioner.  Between that and her admitted convictions for robbery, the jury could conclude this was not her first such offense.  As for the knife, Petitioner's knife was found where Ms. Ontiveros said it would be and had his blood on it.  Petitioner has not provided any evidence to show that Ms. Ontiveros's knife was similar enough to the murder weapon that, had it been introduced, there would have been "a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Accordingly, the petition's request for habeas relief for this allegation of ineffective assistance of trial counsel is DENIED.

> h.   Trial counsel failed to investigate crucial evidence to allow him to cross examine Ms. Ontiveros effectively

Petitioner argues that counsel failed to investigate information with regard to Ms. Ontiveros's background and role in the crime.  He claims that this information could have been used to impeach Ms. Ontiveros's testimony.

The information Petitioner claims counsel did not investigate is the same information he claims in claim twenty that the prosecution failed to disclose.  As discussed below with respect to that claim, even accepting all of Petitioner's facts as true, his claim that trial counsel failed to present evidence to impeach Ms. Ontiveros is without merit.  Thus, even if trial counsel's performance was deficient in failing to discover and present this evidence, Petitioner was not prejudiced by that decision. Accordingly, the petition's request for habeas relief for this allegation of ineffective assistance of trial counsel is DENIED.

72

**United States District Court**
For the Northern District of California

i.   Trial counsel failed to investigate and
present evidence that Mr. Garcia both planned
the crime and killed Mr. Barragan

In support of claim fifteen below, Petitioner's actual
innocence claim, Petitioner submitted a declaration from co-
perpetrator Mr. Garcia.  As discussed with respect to that claim,
the declaration is not credible.  Even if the declaration could be
credited, it still places Petitioner at the scene and "involved"
in the events.  Moreover, the declaration does not state that if
he had been called to testify at Petitioner's trial Mr. Garcia
would have testified to the events as stated in his declaration.
Such a scenario seems unlikely, as Mr. Garcia was also charged
with murder and anything he said in defense of Petitioner at
Petitioner's trial could have been introduced against him at his
own trial.

The only testimony that Petitioner murdered Mr. Barragan came
from the decedent's brother, Mr. Zavala.  Petitioner has not put
forward any additional witnesses who could testify knowingly that
co-perpetrator Mr. Garcia committed the murder.

Petitioner has failed to show either deficient performance or
prejudice and, therefore, has failed to show that the state
court's denial of this claim was unreasonable.  See 28 U.S.C.
§ 2254(d).  Accordingly, the petition's request for habeas relief
for this allegation of ineffective assistance of trial counsel is
DENIED.

j.   Trial counsel failed to investigate and
present evidence to impeach Ms. Sturns'
testimony

Ms. Sturns testified that, around the time of the crime, she
saw two Hispanic men in dark clothes coming out of the backyard of

73

her apartment building, which was located next to the victims'
apartment building.  Petitioner alleges that trial counsel failed
to present evidence of Ms. Sturns' criminal history, which could
have been used to impeach her testimony.

This claim is weak: even if the jury had been made aware of
Ms. Sturns' criminal history, there is no strong inference that
the jury would have found her testimony to be less truthful.
Thus, even if trial counsel's performance was deficient in failing
to use Ms. Sturns' criminal history to attempt to impeach her
testimony, Petitioner was not prejudiced by that decision.
Accordingly, the petition's request for habeas relief for this
allegation of ineffective assistance of trial counsel is DENIED.

> **k.**   **Trial counsel failed to contest meaningfully
>          the prosecution's forensic presentation**

The substance of this claim is the same as that presented in
claim twenty-one.  As discussed below with respect to that claim,
even accepting all of Petitioner's facts as true, his claim that
his counsel failed to present effectively evidence to contest the
criminalist's findings is without merit.  Thus, even if trial
counsel's performance was deficient in failing litigate this
issue, Petitioner was not prejudiced by that decision.
Accordingly, the petition's request for habeas relief for this
allegation of ineffective assistance of trial counsel is DENIED.

> **l.**   **Trial counsel failed to present evidence of
>          Petitioner's brother's mental disabilities**

Petitioner's brother Raymond testified on behalf of the
prosecution that Petitioner explained his arm wound after the
crime as an accident when a car transmission fell on his arm.

Petitioner alleges that trial counsel failed to present evidence of Raymond's mental deficiencies and criminal history to impeach his testimony as unreliable.

This claim is weak. Even if the jury had been made aware of Raymond's intellectual limitations and criminal history, there is no strong inference that the jury would have found his testimony to be less truthful. Thus, even if trial counsel's performance was deficient in failing to use Raymond's intellectual deficiencies and criminal history to attempt to impeach his testimony, Petitioner was not prejudiced by that decision. Accordingly, the petition's request for habeas relief for this allegation of ineffective assistance of trial counsel is DENIED.

### 4.   Conclusion

In sum, the record supports the conclusion that trial counsel's performance, even if deficient in any respect, did not prejudice Petitioner. Given that Petitioner fails to establish that his trial counsel was ineffective under <u>Strickland</u> for these alleged errors, he cannot establish that the state court was unreasonable in its application of <u>Strickland</u>. Thus, these allegations cannot support the petition's claim of ineffective assistance of trial counsel. Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "was based on an unreasonable determination of the facts in light of the evidence presented" to it. 28 U.S.C. § 2254(d). The petition's claim for relief on the ground of ineffective assistance of trial counsel is DENIED.

United States District Court
For the Northern District of California

G.   Claim ten: trial counsel's conflict of interest

Potential witness Laverne Johnson was represented in a capital murder trial by counsel from the same law firm that employed the attorney who represented Petitioner at his trial. Petitioner argues that his trial attorney failed to call Mr. Johnson to impeach Ms. Ontiveros, and that this amounted to deficient representation due to the conflict of interest. Petitioner requests discovery and an evidentiary hearing on this claim.  This claim is procedurally barred as untimely.  Even if it were not procedurally barred, it is without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, see Frady, 456 U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

Under the Sixth Amendment, a criminal defendant is entitled to conflict-free representation.  Garcia v. Bunnell, 33 F.3d 1193, 1195 (9th Cir. 1994) (citing Wood v. Georgia, 450 U.S. 261, 271 (1981)).  If a conflict of interest prevents counsel from advocating on behalf of his or her client without fear or favor, counsel is not playing the role necessary to ensure that the trial is fair.  See Strickland, 466 U.S. at 685-86.

The Sixth Amendment right to conflict-free counsel is violated only if the conflict "adversely affected" trial counsel's performance.  Alberni v. McDaniel, 458 F.3d 860, 872 (9th Cir. 2006) (explaining what petitioner "must show" in the habeas context).  As the Supreme Court explained, "an actual conflict of interest mean[s] precisely a conflict that affected counsel's performance -- as opposed to a mere theoretical division of

loyalties." <u>Mickens v. Taylor</u>, 535 U.S. 162, 171 (2002) (emphasis and internal quotation marks omitted).

### 1.   Discovery

As explained below, Petitioner alleges that Ms. Ontiveros discussed potentially impeaching evidence in letters to Mr. Johnson while they were both in jail.  Petitioner seeks discovery of all the letters exchanged between Mr. Johnson and Ms. Ontiveros.  He has not shown good cause for such discovery.  He proffers nothing but his own speculation that the letters exist with the content he describes.  Thus, his discovery request is DENIED.

### 2.   Evidentiary hearing

As discussed below, the claim fails on its merits. Accordingly, there is no need for an evidentiary hearing.  Thus, Petitioner's request for an evidentiary hearing on this claim is DENIED.  <u>See</u> <u>Sully</u>, 725 F.3d at 1075; 28 U.S.C. § 2254(e)(2).

### 3.   Merits

Mr. Johnson was housed in the San Mateo County Jail sometime in late 1987, around the same time Ms. Ontiveros was housed there. Petitioner claims that Mr. Johnson and Ms. Ontiveros developed a relationship while in jail, through letters.  He argues that, in those letters, "Ontiveros admitted setting up the robbery to Johnson and placed blame for the homicide on Juan Garcia, petitioner's alleged co-perpetrator.  She made no reference to petitioner's role."  Am. Pet. at 133.  He also claims that, in these letters, she expressed her fear of Mr. Garcia and disclosed that she had been in a sexual relationship with an Alameda County Deputy Sheriff.  Petitioner provides only a part of a letter from

Ms. Ontiveros to Mr. Johnson, but in it she writes nothing about Petitioner's case or her own case, nor does she refer to Mr. Garcia or the Deputy Sheriff.  Accordingly, there is no reason to believe that Mr. Johnson, even if called to testify, would have testified as Petitioner speculates.

Petitioner claims his counsel could not call Mr. Johnson as a witness in his case "because he could not advance petitioner's interest to Johnson's detriment.  Calling Johnson as a witness would have had adverse penal consequences to Johnson." <u>Id.</u> at 134.  Petitioner appears to be referring to the penalty that might have faced Mr. Johnson for having a relationship in violation of the jail's rules.  However, Petitioner fails to establish that any actual conflict affected counsel's decision-making.  As Respondent points out, Mr. Johnson was sentenced to death a month before Petitioner's trial began.  Counsel could have reasonably decided not to call Mr. Johnson because the prosecution could have easily impeached him, rendering his testimony, at best, insignificant.  Furthermore, had the relationship been discovered, the penalty to Mr. Johnson would have been <u>de minimis</u> given his death sentence.

Accordingly, the record supports the state court's conclusion that trial counsel was not ineffective due to a conflict of interest.  Thus, Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C.

§ 2254(d).  Accordingly, the petition's claim for relief on the ground of ineffective assistance of trial counsel due to a conflict of interest is DENIED.

H.    Claim eleven: admission of videotaped re-enactment

Petitioner argues that his constitutional rights were violated by the admission of a videotape containing a series of "'reenactments,' which bore not a single fact or circumstance in common with the events of the night of the crime."  Am. Pet. at 135.  Petitioner asserts that the tape was introduced for the purpose of bolstering an eyewitness identification by Maria Vargas, as well as to duplicate the events she testified to witnessing.  Petitioner takes particular issue with: (1) the videotape being filmed during the day, when visibility would be significantly different from that at the actual time of the crime; (2) the fact that it shows a white man running down the stairs in a white shirt, as opposed to a dark-skinned man in dark clothing; and (3) the fact that scenes show Ms. Vargas standing either outside or in an open doorway, although the door was closed during the incident and her view of the perpetrators fleeing was through her window.  Petitioner does not request discovery or an evidentiary hearing on this claim.

The California Supreme Court rejected Petitioner's claim that "the videotape's inaccuracies created a misleading impression of the events witnessed by Vargas."  Rodrigues, 8 Cal. 4th at 1115. The court explained:

> The videotape had been offered as demonstrative evidence to show the jurors the relative locations of the victims' apartment, Vargas's apartment, the rear stairway and the driveway of the apartment building.  In particular, the

United States District Court
For the Northern District of California

videotape had been intended in part to show Vargas's vantage point as she witnessed the assailants flee the scene. Id. at 1114.  By contrast, Ms. Vargas's subsequent testimony established that one of the men she saw escaping, whom she later identified as Petitioner, was a dark-skinned man in dark clothing, that the viewing took place late at night, in the dark, and that she viewed the escaping men through the window.  Id. at 1114-15. The court assumed that the jurors understood and accounted for the discrepancies between the video and Ms. Vargas's testimony.  Id. at 1115.

On habeas review, a federal court considers only whether a conviction violated constitutional norms; where evidence was erroneously admitted, a federal court will grant relief only if that admission violated fundamental due process and the right to a fair trial.  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (explaining that, by contrast, the Supreme Court has made clear that a court should grant habeas relief when constitutional evidentiary errors have rendered the trial fundamentally unfair). Admitted evidence does not violate due process if there is a rational, permissible inference the jury could draw from it. Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).

Here, the evidence was introduced to show the layout of Ms. Vargas's apartment.  It was not admitted for the purpose of showing the lighting conditions at the time she witnessed the men

80

fleeing the apartment building, nor was it admitted for the purpose of showing skin color or clothing color for the men leaving the building the night of the murder.  As the California Supreme Court noted, the distinctions between the events depicted in the videotape and Ms. Vargas's testimony as to what occurred that night, including her vantage point to see it, were obvious. Accordingly, the jury could reasonably infer from the videotape the proper purpose of showing the layout of the apartment building.

Petitioner also argues that admission of the videotape violated his rights because it was admitted in violation of the California Evidence Code.  This is not a cognizable federal habeas claim because a federal habeas court does not review questions of state evidence law.  Henry, 197 F.3d at 1031.

Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d). Accordingly, the petition's claim for relief on the ground that admission of the videotape violated Petitioner's constitutional rights is DENIED.

I.   Claim twelve: prosecution's use of unreliable hearsay identification evidence

This claim is procedurally barred as untimely.  Even if it were not procedurally barred, it is without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, see Frady, 456

United States District Court
For the Northern District of California

U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

Petitioner argues that the admission of hearsay testimony from police detective Ronald Williams violated Petitioner's constitutional rights to "confrontation and cross-examination, the effective assistance of counsel, present a defense, due process, a fair trial, and a reliable, accurate, non-arbitrary determination in a capital case." Am. Pet. at 141. Specifically, Petitioner challenges statements by Detective Williams about Ms. Vargas's identifications of Mr. Garcia as one of the individuals she saw leaving the scene. He also complains of Detective Williams's testimony that neither Ms. Vargas nor Mr. Zavala identified Nathan Howard or Richard Lopez, although they were shown photos of these allegedly alternative suspects. Petitioner does not request discovery or an evidentiary hearing on this claim. The California Supreme Court denied the claim on state law grounds. It also found no violation of the Confrontation Clause because Ms. Vargas had not been discharged at the time of Detective Williams's testimony and she was recalled for rebuttal following his testimony. Rodrigues, 8 Cal. 4th at 1117-19. Petitioner also argued on direct appeal that the admission of the prior identifications of Mr. Garcia denied him due process, a fair jury trial and a reliable guilt determination. Id. at 1119 n.22. The court noted that Petitioner waived these claims, denied them on the merits and concluded that any error was harmless. Id.

Additionally, Petitioner argues that counsel was ineffective for failing to preserve the issue on appeal and failing to cross-

examine Ms. Vargas on her prior identifications.  He also alleges
other constitutional violations, as discussed below.

### 1.   Confrontation Clause violation

The Confrontation Clause of the Sixth Amendment provides that
in criminal cases the accused has the right to "be confronted with
the witnesses against him."  U.S. Const. amend. VI.  The ultimate
goal of the Confrontation Clause is to ensure reliability of
evidence, but it is a procedural rather than a substantive
guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  "It
commands, not that evidence be reliable, but that reliability be
assessed in a particular manner: by testing in the crucible of
cross-examination."  Id.

The Confrontation Clause applies to all "testimonial"
statements.  See id. at 50-51.  "Testimony . . . is typically a
solemn declaration or affirmation made for the purpose of
establishing or proving some fact."  Id. at 51 (internal quotation
marks, brackets and citation omitted).  The Confrontation Clause
applies not only to in-court testimony but also to out-of-court
statements introduced at trial, regardless of the admissibility of
the statements under state laws of evidence.  Id. at 50-51.

Out-of-court statements constitute hearsay when offered in
evidence to prove the truth of the matter asserted.  Anderson v.
United States, 417 U.S. 211, 219 (1974).  The Confrontation Clause
does not bar the admission of testimonial hearsay when the
declarant appears for cross-examination at trial.  Crawford, 541
U.S. at 59 n.9 (citing California v. Green, 399 U.S. 149, 162
(1970)).

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

a.   Statements Regarding Ms. Vargas's
     Identifications of Co-Perpetrator Mr. Garcia
     and Failure to Identify Other Suspects

Ms. Vargas testified about both a photo line-up and a physical line-up. See Ex. 91 at RT 9630-31.  When discussing the photo line-up, Ms. Vargas stated that one of the photographs looked like one of the suspects, but she told the police that she did not think the photograph was of one of the suspects.  Thus, she impliedly testified that she did not select any other photos. She testified that she did not tell the police everything because she was afraid.  Ex. 91 at RT 9631.

Later, Detective Williams confirmed that Ms. Vargas did not identify Nathan Howard or Richard Lopez in the photo line-up.  Ex. 101 at RT 10695.  He testified that she said that the photo of Mr. Garcia had the "same round face" and that the "hair is the same" as the man she recognized, but she also said "I don't think it's any one of them."  Id.  Later, Detective Williams testified that Ms. Vargas identified Mr. Garcia at his preliminary hearing in court.  Id. at RT 10696.

Ms. Vargas was recalled to the stand by the prosecution to rebut testimony given by Detective Williams when he was called as a witness in the defense's case.  See Ex. 106 at RT 11221-29. Petitioner's defense attorney cross-examined her regarding pictures of Petitioner that she may have been shown before making in-court identifications.  Id. at RT 11123-27.  Following this testimony, Ms. Vargas stated that she wanted to leave because her kids were alone.  When asked if she could be excused, the court said: "for now you are."  Id. at RT 11229.  Because Ms. Vargas was

still available to testify, and was recalled following Detective

Williams's testimony, there is no Confrontation Clause violation.

             b.   Victim Zavala's Failure to Identify Other
                 Suspects

    Mr. Zavala testified on cross-examination that he recalled
being shown photographs, but that he was unable to identify anyone
from them.  Ex. 84 at RT 9021.  Thus, he too impliedly testified
that he did not select the photos of any other subjects.
Detective Williams's testimony to the same effect was cumulative.
Like Ms. Vargas, at the conclusion of his testimony, Mr. Zavala
was released temporarily, but was not excused and was subject to
recall.  Ex. 85 at RT 9055.  Therefore, Mr. Zavala was available
to testify and the testimony of Detective Williams to the effect
that Mr. Zavala had failed to identify any other suspects did not
violate the Confrontation Clause.

       2.   Ineffective assistance of counsel on this issue

    As noted above, to succeed on an ineffective assistance of
counsel claim, Petitioner must show that (1) counsel's performance
was deficient, and (2) Petitioner was prejudiced by counsel's
deficient performance.  <u>Strickland</u>, 466 U.S. at 687-88.
Petitioner's defense attorney objected repeatedly during Detective
Williams's testimony about the prior identifications of Mr. Garcia
made by Ms. Vargas during proceedings in Mr. Garcia's case.  Ex.
101 at RT 10697-98.  Counsel also objected to the testimony that
no witness--including Ms. Vargas--ever identified photographs of
Richard Lopez or Nathan Howard.  Ex. 101 at RT 10698.

    Petitioner argues that, to the extent counsel failed to
preserve the issue on appeal and failed to cross-examine Ms.

United States District Court
For the Northern District of California

Vargas on her prior identifications, counsel rendered deficient performance. The record reflects, however, that when Ms. Vargas was recalled to the stand, trial counsel did cross-examine her about her prior identifications. Ex. 106 at RT 11225-27. Ms. Vargas stated that she did not identify anyone in the photographs shown to her prior to the preliminary hearing or in a live line-up and confirmed that she had been shown photographs at the preliminary hearing. Ex. 106 at RT 11227. Further, counsel's failure to preserve the issue on appeal was not prejudicial, as the California Supreme Court addressed the merits of his fair trial and due process arguments. Rodrigues, 8 Cal. 4th at 1119 n.22.

Petitioner has not identified any other potential errors counsel made with respect to this testimony. See Cronic, 466 U.S. at 659 n.26; Young, 435 F.3d at 1042-43. Thus, Petitioner's ineffective assistance of counsel claim with respect to the hearsay identification evidence is DENIED.

> 3.   Other constitutional violations related to this
>      issue

Petitioner alleges that the admission of Detective Williams's testimony violated his rights to due process and a fair trial. Additionally, Petitioner argues that, in its decision denying this claim, the state court used the wrong standard for its harmless error analysis. Petitioner, however, has failed to show that the admission of the evidence violated any of his constitutional rights.

A federal habeas court does not review "questions of state evidence law." Spivey v. Rocha, 194 F.3d 971, 977 (9th Cir.

United States District Court
For the Northern District of California

1    1999).  Habeas relief is inappropriate unless the admission of

2    evidence by the state court violated his due process rights

3    rendering the trial "fundamentally unfair."  Holley, 568 F.3d at

4    1101.  As noted above for claim eleven, the Supreme Court has made

5    "very few rulings regarding the admission of evidence as a

6    violation of due process"; specifically, it has never "made a

7    clear ruling that admission of irrelevant or overtly prejudicial

8    evidence constitutes a due process violation sufficient to warrant

9    the issuance of the writ."  Id.; see Estelle v. McGuire, 502 U.S.

10   62, 70 (1991) (declining to answer whether admitting irrelevant

11   evidence is a violation of due process where it found that the

12   admitted evidence was relevant).

13        Here, Detective Williams's challenged testimony was

14   cumulative of Ms. Vargas's and Mr. Zavala's testimony.  As

15   explained above, Ms. Vargas testified that she did not identify

16   anyone in the photographs she was shown prior to the preliminary

17   hearing or in a live line-up; this meant that she did not identify

18   Richard Lopez or Nathan Howard.  Ex. 91 at RT 9624; Ex. 106 at RT

19   11227.  Mr. Zavala testified on cross-examination that he recalled

20   being shown photographs, but that he was unable to identify anyone

21   from them.  Ex. 84 at RT 9021.  Thus, both Ms. Vargas and Mr.

22   Zavala impliedly testified at Petitioner's trial that they had not

23   identified Richard Lopez or Nathan Howard; they could have been

24   cross-examined on the point by the defense.  Therefore, the state

25   court's determination--that Detective Williams's testimony that no

26   one identified Richard Lopez or Nathan Howard as a potential

27   suspect reflected the state of the record--was not an unreasonable

28

application of federal law or an unreasonable interpretation of the facts.  See Harrington, 562 U.S. at 100.

Thus, Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  Accordingly, this claim is DENIED.

J.   Claim thirteen: exclusion of impeachment evidence

This claim is procedurally barred as untimely.  Even if it were not procedurally barred, it is without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, see Frady, 456 U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

Petitioner argues that the trial court's exclusion of evidence that Mr. Zavala had a strained relationship with his brother violated Petitioner's constitutional rights because the "evidence of closeness suggested that Zavala struggled to focus on Barragan's attacker, despite his injuries, so that the jury should believe his tentative identification and that the identification was motivated by a desire to convict only the actual attacker." Traverse at 107.  Petitioner also argues that the prosecutor's emphasis on their closeness in closing argument amounted to constitutional error because the prosecutor knew it was contradicted by evidence he had successfully excluded, and that trial counsel was ineffective for failing to object to this

United States District Court
For the Northern District of California

argument.  Id. at 110.  Petitioner does not request discovery or an evidentiary hearing on this claim.

The California Supreme Court denied this exclusion of evidence claim based on state law.  Rodrigues, 8 Cal. 4th at 1124-25.  The court denied the prosecutorial misconduct claim based on waiver because trial counsel failed to object.  The court also found there was no prosecutorial misconduct; counsel, therefore, was not ineffective in failing to object.  Id. at 1125-26.  For the reasons stated below, the state court's denial of this claim was not unreasonable.  See Harrington, 562 U.S. at 100.

1.  Exclusion of Evidence

"While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," Holmes v. South Carolina, 547 U.S. 319, 326 (2006), the Supreme Court has not directly considered whether a trial court's exercise of discretion to exclude evidence under a constitutionally sound evidentiary rule violates a defendant's constitutional right to present evidence.  Because there is no clearly established federal law directly on point, the state court's denial of Petitioner's claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

2.  Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct by improperly using the elicited testimony about Mr. Zavala's closeness with his brother during his closing argument to bolster Mr. Zavala's uncertain identification.  The prosecutor argued

United States District Court
For the Northern District of California

that, in light of his loss, Mr. Zavala had every reason to make an accurate identification.

The California Supreme Court denied this claim as waived because Petitioner's counsel failed to object to the prosecutor's statements during trial. However, when analyzing the related ineffective assistance of counsel claim, the court necessarily considered the merits of Petitioner's argument and decided it against him, holding that there was no evidence to indicate that Mr. Zavala would have any reason to make an improper identification of Petitioner. Rodrigues, 8 Cal. 4th at 1125-26. Accordingly, even if there was error, the court determined that such error could not have prejudiced Petitioner.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Phillips, 455 U.S. at 219 ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"); see also Deck v. Jenkins, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that Darden is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes). Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005). On habeas, a prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson

United States District Court
For the Northern District of California

v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995); see Trillo v. Biter, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

Petitioner cannot show that the prosecutor's comments during closing argument, viewed within the context of the trial, so "infected the trial with unfairness as to make the resulting conviction a denial of due process." Johnson, 63 F.3d at 929. The most probative and relevant issues regarding Mr. Zavala's identification were his ability to see clearly what was happening, despite the angle of his view and the blood in his eyes; his inconsistent statements; and the possibility his identification had been influenced by his conversations with Ms. Vargas and the police, all of which were raised extensively in cross-examination. The relative closeness of Mr. Zavala and Mr. Barragan does not negate the other positive identifications of Petitioner by Ms. Vargas and his accomplice Ms. Ontiveros; the finding of his knife where Ms. Ontiveros indicated Petitioner discarded it, with blood on it consistent with Petitioner's blood type, which would show that his injury came from his own knife; Petitioner's injury consistent with that sustained by Mr. Barragan's attacker as described by Mr. Zavala; Petitioner's attempt to secure a false alibi from his brother as to the injury he sustained; Petitioner's lie to doctors as to the source of his injury; and the identification of blood in the trunk of Petitioner's car consistent with Mr. Barragan's blood type. Accordingly, it cannot be said that any comments by the prosecutor that alluded to the close relationship between the brothers in an improper way to

**United States District Court**
For the Northern District of California

1  bolster Mr. Zavala's identification of Petitioner rendered

2  Petitioner's trial fundamentally unfair.

3  　　　　　3.　　Ineffective Assistance of Counsel

4  　　　Petitioner argues that trial counsel was ineffective for

5  failing to object to the prosecutor's misconduct.  As noted in

6  connection with other claims, Petitioner must show both that

7  counsel rendered deficient performance in failing to object and

8  that this deficient performance prejudiced him.  See Strickland,

9  466 U.S. at 700.  Petitioner has not made such a showing.  As

10 noted above, the import of any evidence regarding the nature of

11 the relationship between the brothers was marginal at best in

12 terms of Petitioner's conviction.  Assuming there was

13 prosecutorial misconduct, which Petitioner has not shown, the

14 evidence and the prosecutor's ensuing argument based on it did not

15 render the outcome of Petitioner's trial unreliable.  Therefore,

16 Petitioner cannot show prejudice for the failure to object and

17 this part of his claim fails.

18 　　　For the foregoing reasons, Petitioner has not shown that the

19 California Supreme Court's denial of this claim was unreasonable.

20 Accordingly, this claim is DENIED.

21 　　　K.　　Claim fourteen: failure to preserve evidence

22 　　　Petitioner argues that the prosecution failed to preserve

23 (1) currency allegedly taken from Mr. Zavala and

24 (2) Petitioner's car, for his defense's forensic inspection.  He

25 contends that the state court was unreasonable in failing to hold

26 an evidentiary hearing to determine if the police or the

27 prosecution destroyed the evidence in bad faith.  Petitioner

28 requests an evidentiary hearing on this claim, but not discovery.

United States District Court
For the Northern District of California

This claim is potentially unexhausted; Respondent argues that this claim contains new allegations that were never presented to the state court.  However, as Respondent notes, the Court can deny it without addressing exhaustion.  Thus, even if it is not exhausted, it is denied as without merit, as discussed below.  No evidentiary hearing is warranted.

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means. See California v. Trombetta, 467 U.S. 479, 489 (1984); Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir. 1997).  The Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." Arizona v. Youngblood, 488 U.S. 51, 57 (1988) (describing such evidence as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant").

Petitioner argues that the police or the prosecution destroyed or confiscated $1,000 or $2,000 that Mr. Zavala had on his person at the time of the attack.  As evidence, he supplies an interview with Mr. Zavala conducted by a defense investigator several months after the crime.  Ex. 168, App. 113.  In that interview, Mr. Zavala stated that, after the attack, he went to the hospital with $200 in his back pocket, and approximately $1,000 or $2,000 in his front pocket.  Id. at 21.  Mr. Zavala told the investigator that, after he was discharged from the hospital,

**United States District Court**
For the Northern District of California

he had only the $200 in his back pocket.  Id. at 26.  Petitioner contends that the police either took the money or destroyed it. He argues that the "existence of large amounts of money in the apartment or on Zavala's person at the time of the attack was relevant to undercut the prosecutor's theory that Zavala and Barragan were small-time inexperienced drug dealers preyed upon by their attackers."  Am. Pet. at 149.  He argues that evidence of the money would raise an "inference that the brothers were active drug dealers" and provide "reasonable doubt as to petitioner's guilt by demonstrating that the brothers' livelihood made it likely that others had a motive and opportunity to attack them." Id. at 149-50.

Petitioner does not present any evidence to support the claim that the money actually existed, except for the investigator's interview.  He provides no evidence that the prosecution was aware of the money, even if it did exist.  In addition, there is no evidence that the police or the prosecution took or destroyed any money.  If Mr. Zavala ever had the money, it is more likely that he did not have the money when he was transported to the hospital because one of the perpetrators took the money when they robbed him.  Indeed, in the interview, Mr. Zavala opined that "they took it" referring to "the guys, the attackers."  Ex. 168, App. 113 at 26-27.  Thus, Petitioner states no facts to support the accusation that any money was destroyed or taken by the police, or that the prosecution was aware of any money that was not recorded as evidence by the police.  Furthermore, the presence of the cash is not potentially exculpatory; there is an equal inference that Petitioner robbed Mr. Zavala because he was a wealthy drug dealer.

Furthermore, even if Petitioner stated facts to support his claim that the police or the prosecution took or destroyed the money, he fails to assert that he was unable to obtain comparable evidence by any other reasonably available means. He does not allege that there was no comparable evidence of Mr. Zavala's extensive involvement in the drug trade. Thus, the claimed government destruction of the money cannot, on its own, support a due process violation. Accordingly, the petition's claim that due process was violated when the government destroyed potentially exculpatory evidence of Mr. Zavala's cash is DENIED.

Petitioner also argues that the police destroyed his car in bad faith. He claims that the state's criminalist reported blood in the car, after spraying it with Luminol. He argues that "Luminol, even combined with other chemical agents, frequently yields inaccurate results in that luminol often misreads other fluids such as coca-cola, as blood." Am. Pet. at 150. As a result of the destruction of the car, Petitioner argues, his own investigator did not have the ability to test for the absence of blood. He claims that evidence of the absence of blood in the car would have rebutted Ms. Ontiveros' description of Petitioner's participation in the crime.

However, as Respondent points out, Petitioner's investigator examined the car in July 1987, before the alleged destruction in September 1987. Also, Petitioner's counsel cross-examined the state's criminalist about Luminol's false positives. Thus, Petitioner has not shown that he was unable to obtain comparable evidence by any other reasonably available means. Moreover, there are no facts from which to infer that the car was destroyed in bad

faith.  Accordingly, the petition's claim that the government destroyed potentially exculpatory evidence by destroying Petitioner's car is DENIED.

Thus, the record supports the state court's conclusion that the prosecution did not fail to preserve material evidence. Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  The petition's claim for relief on the ground that the government destroyed potentially exculpatory evidence is DENIED.

L.   Claim fifteen: innocence of capital murder

Petitioner alleges that new evidence, in the form of seven affidavits, shows that he lacked the requisite intent to commit any of the crimes for which he was convicted.  Petitioner does not request discovery or an evidentiary hearing on this claim.  This claim is procedurally barred as untimely.  Even if it were not procedurally barred, it is without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, see Frady, 456 U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

This claim fails on its merits for two reasons.  Petitioner has failed to make the requisite showing of innocence.  It is not entirely clear what standard would be used for a freestanding innocence claim, but the Supreme Court has stated that "the threshold showing for such an assumed right would necessarily be

extraordinarily high." Herrera v. Collins, 506 U.S. 390, 417 (1993).

In Herrera, the petitioner's newly discovered evidence was in the form of affidavits, which the Court discredited for several reasons applicable here. Initially, it noted: "In the new trial context, motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations." Id. The Court noted that the affidavits contained hearsay and that they were provided eight years after the petitioner's trial, and concluded that they were not persuasive in light of the evidence produced at trial. Id. at 417-18.

Similar reasons dictate concluding that Petitioner's affidavits fail to satisfy an "extraordinarily high" standard. With the exception of the affidavit from co-perpetrator Juan Garcia (Ex. 164, App. 19), none of the affiants was present at the victims' apartment the night of the murder. Nor had most of them been in Petitioner's presence within the few days leading up to the crimes. Luis Villasana declared that he had been in Petitioner's presence the day before the murder and had used drugs with him. Ex. 164, App. 12 at 1. Shirley LaVenture declared that she had seen Petitioner a "couple days before" and he appeared "jittery." Ex. 164, App. 25.

Mr. Garcia's affidavit, the only one that could provide an account for the hours leading up to the incident and a description of the event itself, is not credible. His version of events fails to explain how Mr. Barragan was stabbed twenty-one times and how

Mr. Zavala was beaten and stabbed with a tire iron.  Because Mr. Garcia's version of events fails to comport with the evidence adduced at trial, it does not support an actual innocence claim.

The remaining affidavits that would support an actual innocence argument rest on hearsay, describing what Ms. Ontiveros allegedly said regarding the sequence of events.  Because Petitioner has failed to make an "extraordinarily high" showing of his innocence, this claim is DENIED.

    M.    Claim sixteen: prejudicial rereading of testimony during deliberations

Petitioner contends that the trial court erred in allowing prejudicial and incomplete testimony to be re-read to the jury during the guilt phase deliberations.  The jury requested a re-reading of Ms. Vargas's "direct and cross concerning what photo line-ups were shown to her prior to preliminary examination, [and] what identifications were made."  Ex. 114 at RT 11804.  The trial court's re-reading included Ms. Vargas's testimony that she did not identify Petitioner in the photo lineup prior to his preliminary hearing because she was afraid.  Petitioner requested that the court omit Ms. Vargas's statement regarding her fear, or include re-cross examination testimony related to her statement that she was afraid.  The trial court refused his requests.  Petitioner does not request discovery or an evidentiary hearing on this claim.

The California Supreme Court denied this claim.  It held that Ms. Vargas's testimony regarding her fear was directly relevant to her failure to identify Petitioner at the photo lineup.  It reasoned that "[t]o have omitted this testimony as part of the

reading would have grossly distorted the record." <u>Rodrigues</u>, 8 Cal. 4th at 1123.  Furthermore, it held that the trial court did not err when it refused to read portions of Ms. Vargas's testimony on re-cross examination because it concerned her identification of Petitioner at his preliminary hearing and her failure to identify Mr. Garcia during his live lineup.  "Unlike the fear evidence, this other testimony was not responsive to the jury's request for 'what photo lineups were shown to her prior to the preliminary hearing and what identifications were made.'" <u>Id.</u>

Finally, it held that even if the trial court erred, the re-reading was not prejudicial.  First, the reading was brief and presented in conjunction with a re-reading of testimony by two other witnesses.  Second, the re-reading included defense counsel's cross-examination to the effect that if Ms. Vargas was truly afraid of Petitioner, "she could have said what she said at Garcia's live lineup." <u>Id.</u>  The court also noted that, while Petitioner alleges that the re-reading of Ms. Vargas's testimony implied that she was threatened by Petitioner, there is "no suggestion in the record, either from Vargas's own testimony or from the conduct of trial, including the prosecutor's arguments, that the jury had been told or otherwise left with the impression that Vargas's fear might have been attributable to a threat." <u>Id.</u> at 1124.

Petitioner's argument that the trial court erred in reading back selected portions of Ms. Vargas's testimony in response to the jury's request is based on Ninth Circuit cases arising out of federal criminal appeals.  The United States Supreme Court has not issued a ruling on this issue.  Therefore, Petitioner cannot show

that the California Supreme Court's denial of his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The petition's claim for relief on the ground that the trial court erred in allowing a prejudicial re-reading of testimony is DENIED.

N. Claim seventeen: insufficient evidence

This claim is potentially unexhausted; Respondent argues that it contains new allegations that were never presented to the state court. However, as Respondent notes, the Court can deny the claim without addressing exhaustion. Thus, even if it is not exhausted, it is denied as meritless, as discussed below.

Petitioner contends that there was insufficient evidence to support his convictions for burglary, attempted robbery, felony murder and the felony-based special circumstance[8] because the only evidence that supported his intent to enter the victims' apartment for theft purposes was the uncorroborated accomplice testimony of Ms. Ontiveros. California requires corroboration of accomplice testimony. Petitioner argues that, without additional evidence to show that Petitioner entered the victims' apartment with the intent to steal, none of these convictions can be sustained. Petitioner does not request discovery or an evidentiary hearing on this claim.

_____

[8] While Petitioner's death sentence has been vacated, the special circumstances of which he was convicted remain relevant because they require that the only other sentence for which he is eligible is life without the possibility of parole. Cal. Pen. Code § 190.2.

The California Supreme Court denied the claim, concluding that the convictions satisfied the requirements of state law and that Mr. Zavala's testimony provided ample corroboration for Ms. Ontiveros's testimony.   Rodrigues, 8 Cal. 4th at 1128-30.

A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim that, if proven, entitles him to federal habeas relief.   See Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).   The Supreme Court has emphasized that "Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam) (holding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of Jackson when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction).

A federal court reviewing a state court conviction collaterally does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.   Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1993); see also Coleman, 132 S. Ct. at 2065 ("the only question under Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality").   The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.'" <u>Payne</u>, 982 F.2d at 338 (quoting <u>Jackson</u>, 443 U.S. at 319) (emphasis in original).  If no rational trier of fact could have found proof of guilt beyond a reasonable doubt, then habeas relief is granted.  <u>Jackson</u>, 443 U.S. at 324; <u>Payne</u>, 982 F.2d at 338.

Under <u>Jackson</u>'s standard of review, a jury's credibility determinations are entitled to near-total deference.  <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004) (concluding that a credibility contest between a victim alleging sexual molestation and a defendant vehemently denying allegations of wrongdoing was not a basis for revisiting the jury's obvious credibility determination).

In sum, sufficiency of the evidence claims on federal habeas review are subject to a "twice-deferential standard." <u>Matthews</u>, 132 S. Ct. at 2152.  First, relief must be denied if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  <u>See id.</u>  Second, a state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable." <u>Id.</u> (quoting <u>Cavazos v. Smith</u>, 132 S. Ct. 2, 4 (2011) (per curiam)).

California defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence . . . ."  Cal. Penal Code § 211.  To sustain a conviction for attempted robbery, evidence must be produced to show that a defendant (1) harbored a specific intent to commit robbery, and (2) committed a "direct but ineffectual" act toward the commission of the crime.  <u>People v. Dillon</u>, 34 Cal. 3d 441,

452-53 (1983). A burglary conviction requires a showing that the defendant entered a building with the intent to commit larceny or any felony. <u>People v. Davis</u>, 18 Cal. 4th 712, 715 (1998). "To prove a felony-murder special circumstance like murder in the commission of a robbery, 'the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.' . . . It is only when the underlying felony is merely incidental to the murder that the felony-murder special circumstance does not apply." <u>People v. Bolden</u>, 29 Cal. 4th 515, 554 (2002) (citations omitted).

The testimony of accomplice Ms. Ontiveros and of victim Mr. Zavala demonstrates Petitioner's intent to commit robbery. Mr. Zavala testified that upon entering his apartment, co-perpetrator Mr. Garcia asked, "¿Donde la tienes?" (Where do you have it?). Petitioner argues that this statement cannot corroborate the accomplice testimony because it came from co-perpetrator Mr. Garcia. While Mr. Garcia made the statement, Mr. Zavala was the one who testified that the statement was made upon Mr. Garcia and Petitioner's entering his apartment. The statement, in and of itself, conveys an intent to enter the apartment for the purpose of procuring some item from the victims. This inference is further supported by the fact that neither Petitioner nor Mr. Garcia knew the victims and they had no other motive to commit murder.

Petitioner makes much of the fact that Mr. Zavala testified that, after he told Mr. Garcia that what the two men were searching for was in the closet, Petitioner did not go straight to

the closet.  Instead, Mr. Zavala testified, Petitioner directed
Mr. Garcia to kill Mr. Zavala.  It is impossible to know whether
Petitioner would have gone to search the closet at that point
because the phone rang and Mr. Zavala testified that Petitioner
ordered Mr. Garcia to leave in case the police were on their way.
The jury was free to reach its own conclusion.  "<u>Jackson</u> leaves
juries broad discretion in deciding what inferences to draw from
the evidence presented at trial requiring only that jurors draw
reasonable inferences from basic facts to ultimate facts."
<u>Coleman</u>, 132 S. Ct. at 2064 (internal quotation marks omitted).

    Based on the evidence, it is possible that a rational trier
of fact could find Petitioner guilty of burglary, attempted
robbery, felony murder, and the felony murder special
circumstance.  The California Supreme Court's decision that there
was sufficient evidence to support Petitioner's conviction was not
an unreasonable application of <u>Jackson</u> to the facts of this case.
Accordingly, Petitioner has not shown that the state court's
decision was "contrary to, or involved an unreasonable application
of, clearly established Federal law" or that it "resulted in a
decision that was based on an unreasonable determination of the
facts in light of the evidence presented" to it.  28 U.S.C.
§ 2254(d).  This claim is, therefore, DENIED.

    O.   Claim eighteen: denial of right to present defense

    Petitioner argues that he was denied his right to present a
defense when the trial court excluded evidence concerning his and
his co-perpetrators' intent to commit the crimes for which they
were convicted.  He claims that this evidence was relevant to
whether the attempted robbery or the burglary occurred and whether

United States District Court
For the Northern District of California

special circumstances existed.  In particular, at trial, defense
counsel questioned Mr. Zavala on cross-examination concerning
statements he made to the defense's investigator before trial.
Defense counsel asked Mr. Zavala: "And did you tell Mr. Baughman
that you thought it looked like the attackers had come to the
apartment to kill your brother?"  Ex. 85 at RT 9047.  The
prosecution objected to the question, saying that it called for
speculation as to the intent of the attackers.  The trial court
sustained the objection.  Petitioner does not seek discovery or an
evidentiary hearing on this claim.

Petitioner argues that the question was not meant to elicit
speculation, but rather Mr. Zavala's opinion of the intent of the
attackers, as he perceived it the evening of the attack.  He also
argues that the error was prejudicial because the evidence "would
have raised reasonable doubts in the juror's [sic] minds that he
possessed such requisite mental states" as relevant to the special
circumstances regarding the felony-murder charge, as well as the
attempted robbery and burglary charges.  Am. Pet. at 161.

On appeal, the California Supreme Court denied this claim on
its merits.  It held that, even if the trial court erred in
sustaining the prosecutor's objection to the line of questioning,
the perceived error was harmless, given the testimony of Ms.
Ontiveros, who claimed that she, Mr. Garcia, and Petitioner
planned the robbery together.  See Rodrigues, 8 Cal. 4th at 1127.
The court reasoned that, had Mr. Zavala testified that he believed
the attackers came to kill his brother, that testimony "would not
have been necessarily inconsistent with Ontiveros's testimony and
Zavala's other testimony indicating that the two attackers

coordinated their efforts to gain access to the apartment, subdue the brothers, and obtain whatever 'it' was." <u>Id.</u>  Thus, given all of the other evidence the jury heard concerning intent, it was "unlikely that the jury would have believed the motive was other than robbery."  <u>Id.</u>

As the Supreme Court explained, "the standard for determining whether habeas relief must be granted is whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).

The Court finds reasonable the California Supreme Court's holding that even if the trial court erred in preventing Mr. Zavala from stating his opinion of Petitioner's intent, the error was harmless.  As discussed above with regard to claim seventeen, given the weight of the other evidence that established that Petitioner and his accomplices intended to rob Mr. Zavala and his brother, including the testimony of an accomplice, Mr. Zavala's opinion as to the attackers' intent was unlikely to influence the jury to find that the motive was anything other than robbery.

Accordingly, the record supports the state court's conclusion that, even if the trial court erred in excluding Mr. Zavala's opinion concerning the attackers' intent, that error was harmless. Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  The

petition's claim for relief on the ground that the trial court erred in excluding Mr. Zavala's opinion testimony is DENIED.

P.   Claim nineteen: errors in jury instructions

Petitioner raises six challenges to various jury instructions given during the guilt and penalty phases of his trial, a cumulative error challenge, and an ineffective assistance of trial counsel challenge based on counsel's failure to object properly to the instructions or to the evidence underlying them.  Petitioner does not request discovery or an evidentiary hearing on this claim.  This claim is procedurally barred as untimely.  Even if it were not procedurally barred, it is without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, see Frady, 456 U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (stating that "[i]t must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional right]" (brackets in original)).  The instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  See Estelle, 502 U.S. at 72 (quoting Cupp, 414

U.S. at 417).  Habeas relief is available only upon a showing of "actual prejudice."  <u>Brecht</u>, 507 U.S. at 637.

          1.  The trial court's instructions on the legal principles of accomplice corroboration did not adequately guide the jurors

Petitioner argues that the trial court's failure to include his requested addition to the court's accomplice instructions violated his constitutional rights.  The trial court instructed the jury with CALJIC No. 3.11, the standard accomplice testimony instruction.  <u>Rodrigues</u>, 8 Cal. 4th at 1131.  However, it refused to give Petitioner's addition: "As used in this instruction, 'testimony' includes statements made out of court as well as statements made in court by an accomplice."  <u>Id.</u>  Petitioner's counsel requested the addition to clarify that Ms. Ontiveros's statements to the police also needed corroboration.  The California Supreme Court held that while the trial court should have given the requested addition to its accomplice instruction, "the refusal to do so was not prejudicial error."  <u>Rodrigues</u>, 8 Cal. 4th at 1131.

As discussed in claim seventeen above, Ms. Ontiveros's statements were corroborated.  Accordingly, Petitioner fails to show that he suffered any prejudice from the error.

Petitioner also challenges the trial court's failure to give CALJIC No. 3.13, which advises that the required corroboration may not come from a fellow accomplice.  Again, Petitioner argues that the corroborating "¿Donde la tienes?" came from co-perpetrator Mr. Garcia and, therefore, cannot constitute corroboration.  Defense counsel agreed during trial that this particular jury instruction did not apply.  <u>Id.</u> at 1132.  As explained above for claim

**United States District Court**
For the Northern District of California

seventeen, victim Mr. Zavala's testimony sufficiently corroborated Ms. Ontiveros's testimony.  Thus, the trial court did not err in failing to issue the instruction.

In addition, the California Supreme Court's conclusion that co-perpetrator Mr. Garcia's statement implicates none of the concerns addressed in California Penal Code section 1111, the section that requires accomplice testimony corroboration, is binding.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that a state court's interpretation of state law binds a federal court sitting in habeas corpus); Hicks v. Feiock, 485 U.S. 624, 629 (1988) ("We are not at liberty to depart from the state appellate court's resolution of these issues of state law.").  The petition's request for habeas relief for this allegation of constitutionally impermissible jury instruction error is DENIED.

> 2.  The trial court erred in instructing on the law of conspiracy because there was no legally sufficient evidence that Petitioner was involved in a conspiracy

Petitioner argues: "Because there was no evidence as to the existence of a conspiracy except the uncorroborated testimony of an accomplice and the extrajudicial statements of the co-defendant, the jury instructions on the principle of conspiracy should not have been given."  Am. Pet. at 164.  The state court denied this claim on two grounds.  First, defense counsel affirmatively consented to the instruction, which constitutes a waiver of review on appeal.  Rodrigues, 8 Cal. 4th at 1134. Second, in California, "evidence of conspiracy may be admitted even if the defendant is not charged with the crime of conspiracy" and "once there is proof of the existence of the conspiracy there

**United States District Court**
For the Northern District of California

is no error in instructing the jury on the law of conspiracy."
Id.  The California Supreme Court found that the record supported
a finding of evidence of a conspiracy.   Id.

    The Court has already addressed Petitioner's challenge to the
accomplice corroboration requirement above in claim nineteen,
subclaim (1) and in claim seventeen.  To the extent Petitioner is
challenging the California Supreme Court's denial of his claim
based on California law, the state court decision is binding.   See
Bradshaw, 546 U.S. at 76; Hicks, 485 U.S. at 629.  The petition's
request for habeas relief for this allegation of constitutionally
impermissible jury instruction error is DENIED.

> 3.  The trial court erred in failing to instruct
> properly on the legal principles of accomplice
> testimony corroboration

    This allegation is addressed by the analysis of claim
nineteen, subclaims (1) and (2) and in claim seventeen.  The
petition's request for habeas relief for this allegation of
constitutionally impermissible jury instruction error is DENIED.

> 4.  The trial court's charge to the jury invited the
> jury to draw adverse inferences against Petitioner
> that were not supported by the evidence or
> constituted an irrational presumption

    Petitioner challenges five of the trial court's jury
instructions that allowed drawing adverse inferences against him
based on his behavior: (1) CALJIC 2.71.7, pre-offense statements;
(2) CALJIC 2.71.5, adoptive admissions; (3) CALJIC No. 2.03,
consciousness of guilt--falsehoods; (4) CALJIC No. 2.04, efforts
by defendant to fabricate evidence; and (5) CALJIC No. 2.06,
efforts to suppress evidence.  He argues that the instructions

lacked evidentiary support and providing them to the jury violated his constitutional rights.

The California Supreme Court determined that there was sufficient support in the record to warrant issuing each of these instructions. Rodrigues, 8 Cal. 4th at 1136-41. A review of the record supports the state court's determination. Petitioner fails to show that "'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101. Therefore, the petition's request for habeas relief for this allegation of constitutionally impermissible jury instruction error is DENIED.

> 5. The court erred by omitting instructions on the requisite concurrence of actus reus and mens rea for first degree murder and on the requisite degree of proof by circumstantial evidence of mens rea or specific intent for each charged crime

Petitioner makes two specific challenges with respect to this set of allegations. First, he argues that the trial court violated his constitutional rights when it failed sua sponte to instruct the jury with CALJIC No. 2.02 on circumstantial evidence to prove mens rea. The California Supreme Court held that the trial court's failure to instruct the jury with CALJIC No. 2.02 was not prejudicial error because it delivered a more inclusive instruction, CALJIC No. 2.01. Rodrigues, 8 Cal. 4th at 1141-42. A state court's interpretation of state law is binding on a federal habeas court. See Bradshaw, 546 U.S. at 76; Hicks, 485 U.S. at 629.

Second, Petitioner argues that the trial court violated his constitutional rights when it failed to modify CALJIC No. 3.31 sua sponte to guide "the jury on the requisite joint operation of act

and the required premeditation and deliberation needed for first-degree murder." Traverse at 138. The California Supreme Court stated that Petitioner was required to make the request for a modification during trial. The state court also held, relying on state precedent, that CALJIC 8.20, which was given immediately following CALJIC No. 3.31, "adequately expressed the need for joint operation of act and intent on that theory." Rodrigues, 8 Cal. 4th at 1143. As noted above, a state court's interpretation of state law is binding. See Bradshaw, 546 U.S. at 76; Hicks, 485 U.S. at 629.

The petition's request for habeas relief for this allegation of constitutionally impermissible jury instruction error is DENIED.

> 6. The jury was inadequately informed and misguided with respect to the elements of the special circumstances

Petitioner makes two challenges regarding this set of instructions: (1) CALJIC No. 8.83.1 was an insufficient instruction for the mental states required for the special circumstances conviction because it refers to a singular "mental state" as opposed to plural "mental states", and (2) the trial court should have sua sponte instructed the jury with CALJIC No. 3.31 to clear up any confusion regarding the mental states required. Traverse at 139. On direct appeal, Petitioner also argued that the trial court sua sponte should have instructed the jury with CALJIC No. 8.83 to make clear the required mental states. Rodrigues, 8 Cal. 4th at 1143.

The California Supreme Court denied all three of these allegations, again based on failure to request, and held that the

trial court "instructed on the mental state required for each of
the special circumstances (CALJIC No. 8.81.17) immediately before
reading the circumstantial evidence instruction.  Considering the
instructions as a whole, no reasonable juror would have understood
the challenged instruction not to apply to each of the requisite
mental states.  There was no error."  <u>Rodrigues</u>, 8 Cal. 4th at
1143-44.

> The California Supreme Court went on to say:

> Assuming the court's omission [of CALJIC No. 3.31 as to
> special circumstances] constituted error (see Use Note to
> CALJIC No. 8.83.1; Use Note to CALJIC No. 2.02), the
> instructions, when considered as a whole, properly guided the
> jury's consideration of the evidence. [Citation omitted.]
> The jury was instructed that CALJIC No. 3.31 applied with
> respect to the underlying crimes of burglary and attempted
> robbery.  It was also instructed pursuant to CALJIC No.
> 8.81.17. (See fn. 48, <u>ante</u>.) A reasonable juror receiving
> these instructions would have understood that concurrence of
> act and specific intent was required for the special
> circumstance allegations, and could not have believed
> otherwise. [Citation omitted.]  The perceived error was
> harmless under any standard. (<u>Ibid.</u>) . . . .

> [T]he court's version of CALJIC No. 8.83.1 instructed on the
> sufficiency of circumstantial evidence to prove the required
> "mental state" for the special circumstance allegations. (See
> fn. 48, <u>ante</u>.)  A reasonable juror would have understood this
> instruction to apply to the circumstantial evidence
> concerning defendant's purpose in committing the murder.  No
> error appears.

<u>Rodrigues</u>, 8 Cal. 4th at 1144-45.  As with the above subclaims,
Petitioner has failed to show that "'fairminded jurists could
disagree' on the correctness of the state court's decision."
<u>Harrington</u>, 562 U.S. at 101.

The petition's request for habeas relief for this allegation
of constitutionally impermissible jury instruction error is
DENIED.

//

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

7.   Cumulative instructional error

Petitioner has failed to show any single prejudicial instructional error and, therefore, any cumulative prejudicial instructional error.  The petition's request for habeas relief for this allegation is DENIED.

8.   Trial counsel was ineffective for failing to object to erroneous instructions

Because Petitioner has failed to show any prejudicial instructional error, he cannot demonstrate deficient performance of counsel or prejudice.  The petition's request for habeas relief for this allegation is DENIED.

Q.   Claim twenty: prosecution failure to disclose impeachment evidence

Petitioner argues that the prosecution withheld from him impeachment information concerning the bias of Ms. Ontiveros and Mr. Zavala.  Petitioner requests both discovery and an evidentiary hearing on this claim.  This claim is procedurally barred as untimely.  Even if it were not procedurally barred, it is without merit, as discussed below.  For this reason, no exception to the procedural bar applies; Petitioner has not demonstrated prejudice, see Frady, 456 U.S. at 170, and his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

Id. at 87.  The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused.  United States v. Agurs, 427 U.S. 97, 107 (1976).  Further, the duty encompasses impeachment evidence as well as exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 676 (1985).  To succeed on a Brady claim, Petitioner must show: (1) that the evidence at issue is favorable to the accused, because it is either exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued).  See Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

"Brady information includes 'material . . . that bears on the credibility of a significant witness in the case.'"  United States v. Brumel-Alvarez, 991 F.2d 1452, 1461 (9th Cir. 1993) (quoting United States v. Strifler, 851 F.2d 1197, 1201 (9th Cir. 1988)).  "Evidence relevant to the impeachment of a witness adverse to the defendant may be favorable and material when the reliability of the witness may be determinative of the defendant's guilt or innocence."  United States v. Collins, 551 F.3d 914, 924 (9th Cir. 2009) (internal quotation marks omitted).  As the Ninth Circuit has held, "impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."  United States v. Price, 566 F.3d 900, 913-14 (9th Cir. 2009) (brackets omitted) (finding a Brady violation based on the prosecution's failure to disclose evidence of a key witness's criminal history of dishonest and fraudulent conduct); accord Smith v. Cain, 132 S. Ct. 627, 630-31

United States District Court
For the Northern District of California

(2012) (finding impeachment evidence about prosecution's sole witness to be material).

### 1. Discovery

Petitioner argues that the prosecution withheld evidence of both police surveillance of the victims' apartment and monetary and immigration assistance exchanged for Mr. Zavala's testimony. Petitioner seeks discovery as to when the prosecution knew of the police reports of the alleged surveillance and the benefits Mr. Zavala obtained. As discussed below, Petitioner does not present any evidence that police reports of surveillance of Mr. Zavala's apartment actually exist and there are no disputed facts as to the monetary and immigration benefits given to Mr. Zavala. Furthermore, he has not shown good cause for such discovery. Thus, his discovery request is DENIED.

### 2. Evidentiary hearing

As discussed below, this claim fails on its merits. Accordingly, there is no need for an evidentiary hearing. Petitioner's request for an evidentiary hearing on this claim is DENIED. See Sully, 725 F.3d at 1075; 28 U.S.C. § 2254(e)(2).

### 3. Merits

#### a. Ms. Ontiveros

Petitioner argues that the prosecution failed to disclose that Ms. Ontiveros was receiving benefits "in addition to those flowing from the terms and conditions" of her plea bargain. Am. Pet. at 174. Petitioner claims that these additional benefits, including placement in less restrictive prison programs despite her criminal history and continued behavioral infractions, biased her testimony against him. He contends that the prosecutor

allowed Ms. Ontiveros "to testify falsely that no other benefits, aside from those mentioned during her testimony, were bestowed upon her as a result of her status as a prosecution witness" and that the prosecutor "affirmatively represented to the Court that his office did not intercede on Ontiveros' behalf." Id. He also claims that "the prosecutor failed to disclose Ontiveros's history of sexual liaisons with law enforcement; her correspondence with prisoners admitting her ejection from the program, her sexual relationship with an officer, and the role of Garcia in the crime; and, her criminal past with Garcia." Id. at 175.

Petitioner's allegations are insufficient to support this claim. The trial record shows that Petitioner's counsel questioned Ms. Ontiveros about most of the issues Petitioner alleges were not disclosed, including her drug use, her plea deal, and her custodial placement in less restrictive programs. See Ex. 92 at RT 9789-91; Ex. 93 at RT 9890-97. As discussed above in connection with claim fifteen, Petitioner has failed to provide reliable evidence showing that Ms. Ontiveros actually engaged in illicit relationships with police, or that such evidence would have been admissible at trial.

Accordingly, the petition's claim for relief on the ground that the prosecution withheld this impeachment evidence is DENIED.

### b.   Mr. Zavala

Petitioner claims that, after his trial, he learned that a prosecution interpreter had interviewed Mr. Zavala before he testified. Mr. Zavala told her that he had blacked out during the attack and awoke to find his brother dead. Petitioner provides a declaration of the investigator who interviewed the interpreter.

Ex. 186 at Ex. 65.  Petitioner claims, "Such evidence was material and exculpatory on the questions of who killed Andres Barragan —— the 'knife guy' or the 'tire iron guy' —— whether Zavala's in-court identification of petitioner as one of the attackers was credible, and whether his description of events should be believed."  Am. Pet. at 175.  Petitioner was the "knife guy."

However, while Mr. Zavala said that a photograph of Petitioner taken after Petitioner's arrest resembled the man with the knife who attacked the victim, Mr. Zavala's identification of Petitioner at trial was equivocal.  Additionally, Petitioner's counsel thoroughly cross-examined Mr. Zavala about his ability to see his brother's attacker in light of Mr. Zavala's vantage point, the amount of blood in his eyes, and the fact he was being attacked himself.  Therefore, any evidence that he blacked out during the attack would not further impeach his testimony that it was Petitioner who committed the attack.  Accordingly, the petition's claim for relief on the ground that the prosecution suppressed impeachment evidence of Mr. Zavala's black-out during the attack is DENIED.

Petitioner also claims that Mr. Zavala received over $10,000 in benefits from the prosecution in exchange for his testimony. He argues that these benefits were "sufficient to create a bias which would have motivated [Mr. Zavala] to support any theory which the state put forward."  Am. Pet. at 175.  Respondent counters that the bulk of the benefits paid to Mr. Zavala were paid after Petitioner's trial, and that prosecutor could not have disclosed allegedly excessive payments that had not yet been made.

This argument is well-taken.   Furthermore, Petitioner does not state how this evidence would have impeached Mr. Zavala's testimony.   He states vaguely that due to these benefits, Mr. Zavala was motivated to support the prosecution's theory, but he does not allege in what way Mr. Zavala's testimony was false or incorrect.   Thus, Petitioner does not show that this evidence was material, or that the prosecution's failure to disclose it was prejudicial.

Accordingly, the petition's claim for relief on the ground that the prosecution suppressed impeachment evidence of monetary benefits bestowed on Mr. Zavala is DENIED.

Next, Petitioner claims that the San Mateo County District Attorney's office interceded on Mr. Zavala's behalf to gain his legal entry into the United States around the time of Petitioner's trial.   He claims that, at the time of the attack, Mr. Zavala was undocumented and, after the attack, returned to Mexico. Petitioner claims that Mr. Zavala and his family were granted legal entry into the United States and allowed to remain. However, the declarations submitted by Petitioner do not provide any evidence of such intercession.   Indeed, they reflect only routine requests for immigration parole to allow Mr. Zavala to enter the United States for the purpose of testifying.   See Ex. 166, App. 84.

Furthermore, Petitioner does not state how this evidence would have impeached Mr. Zavala's testimony, or to what effect. Thus, Petitioner does not show that this evidence was material, or that the prosecution's failure to disclose it was prejudicial. Accordingly, the petition's claim for relief on the ground that

the prosecution suppressed impeachment evidence of immigration assistance provided to Mr. Zavala is DENIED.

Finally, Petitioner argues that the prosecution failed to disclose reports of ongoing police surveillance of Mr. Zavala's apartment. Yet he does not present any evidence that such surveillance happened, or that any reports of it exist, much less that the prosecution withheld those reports or that they impeached any evidence. Thus, the petition's claim for relief on the ground that the prosecution suppressed impeachment evidence based on police surveillance is DENIED.

Accordingly, the record supports the state court's conclusion that the prosecution did not withhold impeachment information. Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it. 28 U.S.C. § 2254(d). The petition's claim for relief on the ground that the prosecution withheld impeachment evidence is DENIED.

R.   Claim twenty-one: prosecution's use of false testimony

Petitioner alleges two instances where the prosecution used false and misleading testimony. First, he alleges that the "prosecutor used Ontiveros to strongly imply that Mr. Rodrigues was in on and participated in the planning of the robbery," Traverse at 144, even though the prosecutor knew that Petitioner was not a participant in the planning. Second, he alleges that the prosecutor knowingly "elicited and presented false and misleading testimony from his forensic experts during trial." Am.

Pet. at 197.  Petitioner does not request discovery associated with the claim, but he does request an evidentiary hearing.  As discussed above, these claims are procedurally barred.  No exception applies because Petitioner has not demonstrated prejudice, see Frady, 456 U.S. at 170, and because his new evidence does not demonstrate miscarriage of justice, see McQuiggin, 133 S. Ct. at 1933.  This claim is also potentially unexhausted; Respondent argues that it contains new allegations that were never presented to the state court.  Even if these allegations were not procedurally barred or unexhausted, they are without merit, as discussed below.

The Supreme Court has held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103.  So must a conviction obtained by the presentation of false evidence.  See Bagley, 473 U.S. at 678-80 nn.8-9 (explaining that a "'deliberate deception of court and jury by the presentation of testimony known to be perjured' is inconsistent with 'the rudimentary demands of justice,'" and a resulting conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the jury's verdict") (quoting Mooney v. Holohan, 294 U.S. 103, 112 (1935)); Spivey, 194 F.3d at 979 (explaining on habeas that a conviction based on false evidence warrants a new trial if there is a reasonable probability that without the evidence the result would have been different); Napue v. Illinois, 360 U.S. 264, 269 (1959). //

United States District Court
For the Northern District of California

1        1.   Evidentiary hearing

2        As discussed below, this claim fails on its merits.

3   Accordingly, there is no need for an evidentiary hearing.   Thus,

4   Petitioner's request for an evidentiary hearing on this claim is

5   DENIED.   See Sully, 725 F.3d at 1075; 28 U.S.C. § 2254(e)(2).

6        2.   Merits

7        Petitioner alleges that Ms. Ontiveros's testimony at his

8   trial differed from her testimony at Mr. Garcia's trial regarding

9   the extent to which Petitioner was an active participant in

10  planning the robbery.   Petitioner's evidence consists of the trial

11  records of Mr. Garcia's trial to show how the prosecutor

12  emphasized facts differently at the two trials.   Petitioner does

13  not allege that Ms. Ontiveros's testimony at his trial was false,

14  but rather that she strongly implied that he participated in

15  planning the robbery when he had "nothing to do with the

16  planning."   Traverse at 144.   Furthermore, Mr. Garcia's trial came

17  after the conclusion of Petitioner's trial.   Petitioner also does

18  not allege that the prosecution knew Ms. Ontiveros was going to

19  alter her testimony at the second trial.   Therefore, there is no

20  evidence that the prosecutor was aware at the time of Petitioner's

21  trial that Ms. Ontiveros would change her testimony in the future.

22       In addition, evidence that Petitioner participated little in

23  the planning of the crime, when considered with the other evidence

24  against him, likely would not have swayed the jury against

25  convicting him.

26       Petitioner also alleges that the prosecutor elicited false

27  and misleading testimony from his forensic experts.   The

28  criminalist testified at Petitioner's trial that a drop of blood

United States District Court
For the Northern District of California

found outside the victims' apartment could have been a mixture of type A (the victims' blood type) and type O (Petitioner's and Mr. Garcia's blood type).  At Mr. Garcia's trial, the same criminalist testified that the blood was most likely type A alone.  Petitioner does not explain how either of these statements was false.  The criminalist may have truthfully testified that the drop of blood could have been a mixture, but that a mixture was not as likely as a drop of type A blood from a single individual.  Furthermore, even if Petitioner's allegations were sufficient to show that the challenged evidence was false, he does not show "a reasonable probability that without the evidence the result would have been different."  United States v. Endicott, 869 F.2d 452, 455 (9th Cir. 1989).

Accordingly, the record supports the state court's conclusion that the prosecution did not knowingly present perjured testimony or false evidence.  Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  The petition's claim for relief on the ground that the prosecution knowingly presented perjured testimony or false evidence is DENIED.

S.   Claim twenty-two: withholding of discovery

Petitioner argues that the prosecutor withheld a number of items from discovery or prejudicially delayed delivery of certain pieces of discovery until after defense counsel had made strategic decisions that might have been different had counsel known of the

evidence the prosecutor had.  Petitioner does not request

discovery or an evidentiary hearing on this claim.

Many of the instances of delayed discovery that Petitioner

cites relate to the penalty phase of his trial.  Because

Petitioner is no longer subject to a capital sentence, those

allegations are moot.  A few allegations are still viable because

they relate to the guilt phase of his trial.

The standard for disclosure of impeachment or exculpatory

evidence is explained above in claim twenty.  In sum, for a Brady

claim to succeed, a petitioner must show: (1) that the evidence at

issue is favorable to the accused, either because it is

exculpatory or impeaching; (2) that it was suppressed by the

prosecution, either willfully or inadvertently; and (3) that it

was material (or, put differently, that prejudice ensued).  Banks,

540 U.S. at 691; Strickler, 527 U.S. at 281-82.

With respect to the guilt phase of his trial, Petitioner

challenges the prosecution's failure to provide at all or in a

timely manner: (1) a comparison of the hairs removed from the

deceased victim's hand to those found on the knife that was the

alleged murder weapon; (2) an examination of physical evidence

taken from Petitioner's car; (3) an analysis of eleven valid but

unidentified fingerprints taken from Petitioner's car; and (4) a

report from the national database on the bloody fingerprints

lifted from the victims' door, which Petitioner acknowledges was

never completed.  Am. Pet. at 209-10.  Petitioner also challenges

the prosecution's failure to disclose the addresses and criminal

history of the 120 witnesses on its witness list in a timely

manner.  Petitioner specifically argues that had his counsel been

124

able to procure the presence of James Williams at trial, his counsel would have been able to establish that the unidentified bloody prints on the door did not belong to Mr. Williams and would, therefore, have supported Petitioner's defense that an unknown third party committed the murder. Id. at 214-15. This claim was presented to the state court for the first time in Petitioner's initial state petition for writ of habeas corpus. The California Supreme Court denied the claim on the merits without further explanation. Ex. 172.

Prior to trial, the court held a number of hearings on discovery motions filed by Petitioner's counsel. See, e.g., Ex. 23 at RT 313, 323-27; Ex. 25 at RT 902-24; Ex. 31 at RT 2784-818; Ex. 52 at RT 5338-80; Ex. 63 at RT 6910-36; Exs. 72 and 73 at RT 8048-213; and Ex. 74 at RT 8259-72. During these hearings, the trial court heard all of Petitioner's counsel's concerns regarding delayed or denied discovery up to that point. The trial court ultimately determined that "there was not either overt or either negligent attempt to conceal information. In fact, all of the information is available." Ex. 74 at RT 8273.

It appears from Petitioner's briefing, the trial record, and Petitioner's first state habeas petition that the four items Petitioner argues the prosecution should have surrendered do not exist.

i.   Hair Found on Victim's Hand and on the Knife

Petitioner acknowledges that the hair sample testing he believes should have been conducted, specifically comparing the unidentified hair samples on the victim's hand to the unidentified hair samples on the murder weapon, was never conducted. Am. Pet.

at 209.  Petitioner notes the samples were compared with the
victim, his brother, Ms. Ontiveros, Mr. Garcia, and Petitioner.
Id.  Because those tests yielded negative results, he argues that
the two unidentified sets of samples should be compared against
each other.  Id.  Petitioner appears to argue that if the notes
indicating the absence of such testing had been disclosed to
counsel sooner, counsel could have conducted such testing on their
own and that the results would have been exculpatory.  Id.

Petitioner's expectation about the results of any such
testing is speculative.  To state a Brady claim, Petitioner "is
required to do more than 'merely speculate'" about what such
testing would reveal.  Runningeagle v. Ryan, 686 F.3d 758, 769
(9th Cir. 2012).  Thus, Petitioner has not shown that the
prosecution failed to turn over exculpatory evidence and has,
accordingly, failed to make the requisite showing to prevail under
Brady on this claim.

Moreover, Petitioner has not shown that he has been
prejudiced by the prosecutor's failure to turn over notes in a
timely manner indicating that such testing had not been done.
Petitioner "does not need to prove that a different result would
have occurred in his case.  He needs to show only that the state
court unreasonably decided that there was not 'a reasonable
probability of a different result.'"  Aguilar v. Woodford, 725
F.3d 970, 983 (9th Cir. 2013) (citation omitted).  A "reasonable
probability" may not be based on mere speculation without adequate
support.  See Wood v. Bartholomew, 516 U.S. 1, 6-8 (1995).

The failure to provide timely testing reports on the hair
analysis was challenged at the "omnibus" discovery hearings

United States District Court
For the Northern District of California

occurring on June 13 and 14, 1987.  See Exs. 72 and 73 at RT 8048-213; Ex. 74 at RT 8259-72.  Petitioner's counsel challenged the prosecution's failure to submit the hair samples for analysis in a timely fashion.  Ex. 74 at RT 8261.  The prosecution argued that there had been a delay in getting a court order to require Petitioner to submit to a hair analysis and that hair analysis was labor intensive and time consuming.  Ex. 74 at RT 8263-66.  As noted, the trial judge found no attempt to withhold.  Even if the prosecution had withheld the hair testing analyses and notes, the record indicates that defense counsel also had received hair samples, from which they could have conducted their own testing.  Ex. 74 at RT 8265.  Petitioner's defense, therefore, was not prejudiced by the prosecutor's failure to submit the hair analysis in a more timely fashion.

ii.   Physical Evidence Taken from Petitioner's Car

Petitioner challenges the prosecutor's failure to take photographs of the Luminol tests conducted on his car and the prosecutor's failure to notify him of the destruction of the car. Petitioner's argument about potential false positives identified by Luminol, and any potential prejudice, was addressed in the discussion of claim fourteen above.  His argument, that photographs of the Luminol test results should have been taken, does not support a finding of a Brady violation.

As for the opportunity to conduct his own evaluation of the car, Petitioner's investigator examined the car in July 1987, months before the alleged destruction of the car in September 1987.  Petitioner's counsel cross-examined the state's criminalist about Luminol's false positives.  He has not shown that the

prosecution withheld any evidence that could not have been discovered by the defense's investigation.  Accordingly, he has not shown prejudice from the destruction of the car.

iii. Two Sets of Unidentified Fingerprints

Petitioner challenges the prosecution's failure to run through a national database eleven valid fingerprints taken from his car.  Am. Pet. at 210.  Similarly, he challenges the prosecution's failure to run through the same database bloody fingerprints found on a door in the victims' apartment.  Id. Petitioner's belief that the results of these tests would provide exculpatory evidence is speculative.

Again, also, he has failed to show prejudice.  While Petitioner argues that the murder was actually part of a drug deal with unknown parties gone awry, he has produced no evidence to support such a defense.  Petitioner has not explained how unidentified fingerprints in his own car could indicate another attacker.

As for the bloody fingerprints on the victims' door frame, Petitioner did have the opportunity to question the prosecution's criminalist, Stanley Baker, about the possibility that at least one of the bloody fingerprints could have been from James Williams, a man identified by the police as having been in the area of the victims' apartment the day of the murder.  Mr. Baker testified that one bloody print had characteristics that were similar to Mr. Williams's fingerprints and such characteristics were shared by only five percent of the population.  Ex. 88 at RT 9304.  Mr. Baker, however, could not positively identify the fingerprint as belonging to Mr. Williams.  Ex. 88 at RT 9304.

United States District Court
For the Northern District of California

From this, Petitioner argues that the fingerprints in question were not Mr. Williams's as asserted by the prosecution, but belonged to an unknown assailant.  Even if Petitioner were able to show that the fingerprints did not belong to Mr. Williams, he would not be able to show that the California Supreme Court's decision was unreasonable.

Petitioner also argues that a list of witness addresses and convictions was not timely provided, but the only guilt phase potential witness about whom he sought information was Mr. Williams.  While Petitioner argues that counsel would have been able to interview Mr. Williams and procure a new fingerprint sample if they had been provided his address in a timely fashion, the exculpatory value of the information Mr. Williams could provide is speculative.  Moreover, the testimony in the case indicates that even if defense counsel had been provided with the address police had on file, they may not have been able to locate Mr. Williams.  Mr. Baker testified that he had requested another fingerprint sample from Mr. Williams; however, Mr. Williams was no longer in the area and police could not locate him.  Id. at RT 9305.

Petitioner has not shown that the evidence he says was withheld was exculpatory or had impeachment value; that the state withheld it, either intentionally or negligently; or that he was prejudiced by not having it.  Therefore, he has failed to show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to

it.  28 U.S.C. § 2254(d).  Accordingly, the petition's claim for
relief on the ground that the state withheld discovery is DENIED.

T.   Claim twenty-four: witness interference

Petitioner argues that the prosecutor improperly interfered
or tampered with the testimony of five witnesses: Rejon Mitchell,
Hilario Rodriguez, Ricky Calles, Officer Leo Rodriguez, and
criminalist Elizabeth Skinner.  With the exception of Ms. Skinner,
these witnesses testified at the penalty phase of Petitioner's
trial for the purposes of presenting aggravating factors that
would subject Petitioner to the death penalty.  Because Petitioner
is no longer subject to a capital sentence, the claims as to these
witnesses are moot.

Petitioner explains the following sequence of events.  Ms.
Skinner testified at the guilt phase that none of the blood found
at the scene could have belonged to Petitioner.  Later, the
prosecution announced that she wanted to introduce a changed
opinion.  At a hearing, Ms. Skinner testified about two changes of
opinion.  A sample of blood on the doorway to the victims'
apartment did in fact test consistent with Petitioner's blood
transferrin factor type of CD; it was not a C result as she had
initially reported.  Also, co-perpetrator Mr. Garcia's blood was
actually type 2 in a GC test, not a type 2-1 as she had initially
reported.  The trial court excluded her new opinion about
Petitioner's blood type, but the change of opinion was reported in
the local press during the guilt phase of the trial.  Am. Pet. at
224.  Petitioner does not request discovery or an evidentiary
hearing on this claim.

United States District Court
For the Northern District of California

Regarding Petitioner's blood, Respondent emphasizes that Ms. Skinner did not testify at trial as to her changed opinion. Additionally, Respondent asserts that Ms. Skinner's changed opinion about Mr. Garcia's blood type in the GC test was not prejudicial to Petitioner. Petitioner has failed to show that the California Supreme Court's denial of this claim was unreasonable. Because the challenged testimony was excluded from trial, Ex. 96 at RT 10203-04, Petitioner cannot show that he was prejudiced in any way by it.

Petitioner notes that media reports covered Ms. Skinner's new opinion that blood at the crime scene was consistent with his, but fails to make any assertion or showing that the jury actually saw this coverage. The jurors were instructed not to read any newspaper accounts, listen to radio programs or view television programs regarding the case during the trial. Ex. 78 at RT 8492. Jurors are presumed to follow their instructions. <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987).

Accordingly, the record supports the state court's conclusion that the prosecution did not commit misconduct related to witness interference. Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it. 28 U.S.C. § 2254(d). Thus, the petition's claim for relief on the ground that the prosecution interfered with witnesses is DENIED.

//

//

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

U.   Claim forty-one: erroneous removal of jurors for cause

In this claim, Petitioner challenges the trial court's removal of potential jurors Melissa Cassiday and Grace Levario for cause.  He argues that their responses to questions regarding whether they could impose the death penalty were not sufficiently problematic to warrant their removal.  Petitioner does not request discovery or an evidentiary hearing on this claim.

The California Supreme Court denied this claim stating: "The voir dire of prospective jurors Levario and Cassiday amply supported the trial court's decision to exclude them."  Rodrigues, 8 Cal. 4th at 1147.

In light of the facts that these jurors were excused based on their opinions regarding the death penalty and Petitioner is no longer subject to a capital sentence, this claim is moot.  Even if it were not, Petitioner has failed to show that the exclusion of these two jurors prejudiced him and had a substantial and injurious effect on the jury's verdict, because the death sentence was vacated.  See Brecht, 507 U.S. at 629.

Moreover, there is no merit to this claim.  Petitioner relies on Wainwright v. Witt to support his argument that potential Jurors Levario and Cassiday should not have been excused based on their expressed views regarding capital punishment.  469 U.S. 412 (1985).  In that case, the following exchange took place with a juror whom the trial court excused:

> [Q. Prosecutor:] Now, let me ask you a question, ma'am.  Do you have any religious beliefs or personal beliefs against the death penalty?
> [A. Colby:] I am afraid personally but not—
> [Q]: Speak up, please.
> [A]: I am afraid of being a little personal, but definitely not religious.

**United States District Court**
For the Northern District of California

```
[Q]: Now, would that interfere with you sitting as a juror in
this case?
[A]: I am afraid it would.
[Q]: You are afraid it would?
[A]: Yes, Sir.
[Q]: Would it interfere with judging the guilt or innocence
of the Defendant in this case?
[A]: I think so.
[Q]: You think it would.
[A]: I think it would.
[Q]: Your honor, I would move for cause at this point.
THE COURT: All right. Step down.
```

Id. at 415-16.  The United States Supreme Court found this

exchange to be a sufficient basis on which to exclude the juror.

Id. at 435.  The Supreme Court also noted that such a claim is a

factual one and, when raised in the context of a petition for writ

of habeas corpus, is entitled to deference.  Id. at 426-30.  Since

this case was decided, Congress enacted AEDPA, which substantially

circumscribed the standard of review for factual determinations.

Under AEDPA, state court findings of fact "are presumed correct"

unless rebutted by clear and convincing evidence.  Miller-El v.

Cockrell, 537 U.S. 322, 340 (2003); see also Gonzalez v. Pliler,

341 F.3d 897, 903 (9th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

Petitioner has failed to make such a showing.

Exchanges took place during the voir dire of potential jurors

Levario and Cassiday similar to, though more extensive than, the

one in Witt, where the Court upheld dismissing the potential

juror.  Accordingly, Petitioner cannot show that the California

Supreme Court decision denying this claim was unreasonable.

1.    Potential Juror Levario

When initially questioned, Ms. Levario stated, "I would never

vote, you know, for [the death penalty] or against it.  I would

have to, like I said, hear the case."  Ex. 35 at RT 3350.

Petitioner relies on this to argue that Ms. Levario showed that

133

1  she could be impartial and follow the trial court's instruction.

2  However, she immediately thereafter said, "I don't really feel

3  like I could answer that right now because I don't really know how

4  I'm going to feel after I -- I think maybe I could, but I don't,

5  I'm not positive at this time, you know, how I'm going to feel."

6  Id.

7      The trial court then asked, "Do you think that you would be

8  in a position where under no circumstances could you ever impose

9  the death penalty?"   Id. at RT 3351.  She replied, "I think so."

10  Id.  Her answers got stronger as the prosecutor questioned her

11  further.

> [Q]: Do you feel that if you were selected as a juror in this case and were asked to go into the jury room with your fellow jurors to decide whether or not to impose the death penalty . . . on a person that your inner feelings would be such that you'd find yourself in a position where you'd have to say, "I just don't think I can do it"?
> [A]: I believe so, that I would be that type of person.
> . . . .
> [Q]: And at this point, do you feel that if you were put in that position that your -- your feelings about life and death are such that you possibly would not be able to cast a vote for the death penalty?
> [A]: Like I said, I have mixed emotions about it, but I believe I will have a problem deciding, yes.
> [Q]: Okay.  If I might just ask a couple of further questions.  The problems that you feel in that regard, are they because of your conscientious feelings about life and death?
> [A]: I think so and I also think that -- I don't know, I just feel like God is the only one that can, you know, really make that judgment on a person, but –
> [Q]: There are some people who hold that belief very dearly and it's not necessarily a wrong belief.
> [A]: Right.
> [Q]: Unfortunately in this case we're attempting to find 12 people who are not, I don't want to say burdened because it sounds like it's wrong, burdened with feelings such as that such that in the final analysis they say, "Gee, though I believe in the law, when it comes to me actually imposing it I don't think I can.  Do you feel you're one of these persons?
> [A]: I think so.

134

**United States District Court**
For the Northern District of California

1   Id. at RT 3353-55.

2       Defense counsel attempted to rehabilitate her and asked her

3   questions about her ability to adhere to the judge's instructions.

4   She indicated that she could be impartial, though she remained

5   equivocal about it.  She said, "I would really need a lot of

6   evidence, it would really have to be the real bad against the good

7   to even -- but I -- like I said, I have mixed emotions.  I don't

8   know whether I can say the death penalty right there and then."

9   Id. at RT 3357.

10      The trial court then questioned her again based on a

11  perceived contradiction in her answers about whether she could

12  impose the death penalty.  The following exchange took place:

13      [Q]: Now, if you imagine that after you've heard the evidence
        of aggravation and mitigation, that is, the bad as opposed to
14      the good, and you find that the bad outweighs the good and
        that the bad is substantial when compared to the good, and
15      you are faced with the possible choice between the two
        penalties, if you thought that the evidence in the case
16      justified it, that is, justified the death penalty, could you
        vote to put someone to death?
17      [A]: I don't think so, no.
        . . . .
18      [Q]: Just to rephrase.  Are you telling us that in, under no
        circumstances in any case even though you felt that the
19      penalty of death was justified that could you vote for death?
        [A]: I don't think so.  I -- I just can't understand really
20      the death and the life imprisonment, it, to me, it's just an,
        almost just as bad life imprisonment.
21

22  Id. at RT 3358-59.

23      Potential juror Levario was subjected to much more thorough

24  questioning than the potential juror at issue in Witt and was much

25  clearer about her inability to vote to impose the death penalty

26  even if she believed it was warranted under the circumstances of

27  the case.  The trial court here stated that "it's clear to the

28  court that under no circumstance even though she would believe

135

that the facts would justify it in fact could she impose it." <u>Id.</u>
at RT 3360.  Petitioner has failed to offer clear and convincing
evidence that would rebut the presumption that this finding was
correct.

> 2.   Potential Juror Cassiday

When potential Juror Cassiday was questioned initially, she
noted that she would have a problem "feeling no prejudice for the
defendant" because he looked identical to her ex-brother-in-law,
who was an alcoholic and hit her sister.  Ex. 38 at RT 3624.  She
was not dismissed for this reason because she did say that she
would "rise above it"; however, she felt it significant enough to
note on her questionnaire and discuss openly with the court.  <u>Id.</u>
at RT 3626.

She was excused because of her inability to vote to impose
the death penalty.  Her exchanges with the court indicated a
significant likelihood that she would not be able to cast such a
vote:

> [Q]: Okay.  The real question is if you're faced with that
> situation in which you've made that independent decision
> you've come across it fairly and honestly and you've come to
> the conclusion, "Yes, this is a case that warrants the death
> penalty," is there going to be any feelings or any belief
> that's going to prevent you or substantially impair you in
> casting that vote for the death penalty?
> [A]: It's possible.
> [Q]: That leaves us right --
> [A]: It just hit me, you know, then you said, the way you --
> yes, it's possible.
> [Q]: This is probably the toughest thing you're going to do
> in a long time.  We need to ask you to take that possible and
> turn it into your best prediction of whether you're going to
> be able to do that or not because unfortunately once you're
> selected there are no tomorrows.
> [A]: I know.
> [Q]: And we have to know.
> [A]: If I -- okay.  I have to weigh the two, go between yes
> and no, right?
> [Q]: I don't know of any other way to give an answer.

[A]: Right.  I -- I don't know if I could do it, no.
Probably -- I don't know, I really don't, honestly.
. . . .
[Q]: Okay.  Do you feel at this point that looking into the
future you were placed into a position where you
intellectually and rationally understood that the death
penalty was the appropriate verdict that you would still be
substantially impaired in your ability to go ahead and follow
the law and cast that vote just because of your personal
hesitation or moral views?
[A]: Moral views, I guess, yeah.  Sleeping at night, yes, I
think so.

Id. at RT 3644-45.  Like that with Ms. Levario, this exchange is
much more in-depth than the one upheld by the Supreme Court in
Witt.

Defense counsel did not attempt to rehabilitate Ms. Cassiday,
nor did he indicate a disagreement with the prosecutor's motion to
excuse her under Witt, as he did with Ms. Levario.  Id. at RT
3646.  The trial court concluded that "after listening to the
prospective juror after observing, her evaluating her questions, I
mean her responses to the questions, her demeanor, the court is
convinced that she would be impaired, therefore, she'll be
disqualified."  Id.  Again, Petitioner has failed to offer clear
and convincing evidence to rebut the presumption that this factual
finding was incorrect.

Even if this claim were not moot, Petitioner has failed to
show that the California Supreme Court's denial of it was
unreasonable or that the disqualification of these two potential
jurors prejudiced him.  Thus, Petitioner has not shown that the
state court's decision was "contrary to, or involved an
unreasonable application of, clearly established Federal law" or
that it "resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented" to
it.  28 U.S.C. § 2254(d).  Accordingly, this claim is DENIED.

137

V.   Claim forty-four: ineffective assistance of
      appellate counsel

Petitioner asserts six grounds for habeas relief due to ineffective assistance of appellate counsel.  He does not request discovery or an evidentiary hearing on this claim.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland, 466 U.S. at 668.  See Smith v. Robbins, 528 U.S. 259, 285 (2000); Moormann v. Ryan, 628 F.3d 1102, 1106 (9th Cir. 2010); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a non-frivolous issue.  See Smith, 528 U.S. at 285; Moormann, 628 F.3d at 1106.  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  See Smith, 528 U.S. at 285-86; Moormann, 628 F.3d at 1106.

Appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by the defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller, 882 F.2d at 1434 n.10.  Weeding out weaker issues is widely recognized as one of

the hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Therefore, appellate counsel will frequently act above an objective standard of competence and cause their clients no prejudice for the same reason: because they declined to raise a weak issue.  Id.

Furthermore, as discussed above, under AEDPA the Court must afford the state court's determination of an ineffective assistance of counsel claim additional deference.  The question is not merely if counsel was ineffective under Strickland, but whether the state court's decision was unreasonable.  See Harrington, 562 U.S. at 101.

1.   Failure to advance all meritorious legal bases

Petitioner alleges that appellate counsel failed to "advance all meritorious legal bases for issues presented on petitioner's behalf on direct appeal."  Am. Pet. at 295.  Petitioner incorporates claims six, twelve, thirteen, nineteen, twenty, thirty, thirty-two, thirty-six, thirty-nine, forty and forty-three in this allegation.[9]  Petitioner concedes: "State appellate counsel raised each of these issues during their representation" of him.  However, Petitioner alleges, appellate counsel "failed to provide the legal bases articulated [in this petition] in support of those claims."  Id.

As discussed above, "appellate counsel does not have a constitutional duty to raise every nonfrivolous issue."  Miller,

_____

[9] Many of these claims were already denied as moot because they were related to the imposition of Petitioner's death sentence, namely claims six, thirty, thirty-two, thirty-six, thirty-nine, forty and forty-three.

United States District Court
For the Northern District of California

139

882 F.2d at 1434 n.10.  Here, Petitioner admits that these issues were raised.  While Petitioner argues that he rests his ineffective assistance of appellate counsel claim on deficient briefing of "all meritorious legal bases," Petitioner fails to show that appellate counsel acted unreasonably in failing to advance every meritorious legal basis for the claims in his state appeal.  As discussed above, none of Petitioner's claims is meritorious; thus appellate counsel was not deficient in failing to assert all non-frivolous issues or bases for them.

Furthermore, Petitioner fails to demonstrate prejudice. Apart from conclusory statements that "had appellate counsel raised these issues on direct appeal" -- and Petitioner admits that appellate counsel did raise them -- "the state court would have granted relief."  Am. Pet. at 295.  To the contrary, Petitioner concedes that the California Supreme Court addressed each of his issues and found that they lacked merit.  Even if Petitioner could establish that some briefing errors occurred, he does not establish that he was prejudiced by the alleged errors.

Likewise, given that Petitioner fails to establish that his appellate counsel was deficient under Strickland for these alleged errors, he cannot establish that the state court was unreasonable in its application of Strickland.  Accordingly, these allegations cannot support the petition's claim for relief on the ground of ineffective assistance of appellate counsel.

//

//

//

//

**United States District Court**
For the Northern District of California

2.    Failure to raise meritorious issues, causing
procedural default

Petitioner claims appellate counsel was ineffective for failing to raise certain issues on appeal, leading to those claims being procedurally defaulted for purposes of state habeas review.

Petitioner argues that, due to the failure of appellate counsel to raise them, claims nine, ten, twenty and twenty-one were not "properly presented" on direct appeal.[10]  Claims nine and ten are ineffective assistance of trial counsel claims.  Claim twenty argues that the prosecution withheld material evidence.  Claim twenty-one argues that the prosecution used false and/or perjured testimony in its case against him.  However, none of these claims was procedurally defaulted based on failure to raise it on direct appeal.  Rather, as stated above, this Court found these claims to be procedurally defaulted because they were untimely when presented to the state court.

Under Martinez, 132 S. Ct. 1309, an exception to this procedural default rule may permit relief where appellate counsel failed to raise on appeal claims of ineffective assistance of trial counsel.  Cause may exist for excusing a procedurally defaulted claim of ineffective assistance of trial counsel where a petitioner could not have raised the claim on direct review and was afforded no counsel or only ineffective counsel on state collateral review.  Id. at 1315.  The Supreme Court reaffirmed and expanded the Martinez exception in Trevino v. Thaler, applying it

---

[10] Petitioner also included claims seven and eight in this allegation.  Those claims addressed Petitioner's death sentence and, thus, are moot.

United States District Court
For the Northern District of California

to a petitioner in any state whose "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise the claim of ineffective assistance of trial counsel on direct appeal." 133 S. Ct. 1911, 1918-21 (2013). The Martinez exception arguably applies to California under the rationale of Trevino because California law provides that "except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal." People v. Lopez, 42 Cal. 4th 960, 972 (2008).

The Martinez exception does not apply because it applies to default based on failure to raise an issue on appeal, rather than untimely presentation to the state court. Even if the Martinez exception applied, Petitioner would be able to overcome the procedural default of only claims nine and ten because they allege ineffective assistance of trial counsel. As discussed above, even if claims nine and ten were not procedurally defaulted, they are without merit. Appellate counsel was not ineffective for failing to raise meritless claims.

Accordingly, even if appellate counsel caused the procedural default, Petitioner has not shown that appellate counsel was in error or that caused any error was prejudicial. Accordingly, these allegations cannot support the petition's claim for relief on the ground of ineffective assistance of appellate counsel.

//

//

//

### 3.   Failure to raise trial counsel's failure to impeach

Petitioner next argues that appellate counsel unreasonably failed to raise an ineffective assistance of trial counsel claim for failure to impeach four prosecution witnesses at trial.  In this claim, he incorporates the allegations included in claim nine.  He argues that, given the witnesses' extensive criminal histories, the jury would have "realized that each of these witnesses was highly impeachable, based on their criminal records alone."  Am. Pet. at 295.

As discussed above, to determine whether appellate counsel's failure to raise a claim of ineffective assistance of trial counsel on this ground was objectively unreasonable and prejudicial, this Court must first assess the merits of the underlying claim that trial counsel provided constitutionally deficient performance.  Moormann, 628 F.3d at 1106-07.  If trial counsel's performance was not objectively unreasonable or did not prejudice Petitioner, then appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective assistance of trial counsel, and Petitioner was not prejudiced by appellate counsel's omission.  Id.

As discussed above, claim nine lacks merit.  Petitioner fails to establish that an ineffective assistance of trial counsel claim on this ground was meritorious.  On its face, the claim is weak: even if the jury had been made aware of these witnesses' criminal histories, there is no strong inference that the jury would have found their testimony to be untruthful.  As stated above, the weeding out of weaker issues is widely recognized as one of the

hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Thus, Petitioner does not establish that appellate counsel was unreasonable not to raise this issue, nor that he was prejudiced by this alleged deficiency.

Likewise, given that Petitioner fails to establish that his appellate counsel was deficient under Strickland for these alleged errors, he cannot establish that the state court was unreasonable in its application of Strickland.  Accordingly, these allegations cannot support the petition's claim of ineffective assistance of appellate counsel.

4.   Failure to request judicial notice

Petitioner argues that appellate counsel was deficient for failing to request that the state court take judicial notice of the entire reporter's and clerk's transcripts in People v. Juan Garcia, San Mateo County Superior Court No. C-20836, the trial of his co-perpetrator.

Petitioner fails to establish prejudice.  Even if appellate counsel had requested that the state court take judicial notice of the transcripts, Petitioner has not established that the state court would have granted his request.  Furthermore, he does not establish that anything in the transcripts would have led to a more favorable outcome, such that his conviction would have been reversed.  Hence, he fails to show that appellate counsel was unreasonable for failing to make this request.

Given that Petitioner fails to establish that his appellate counsel was deficient under Strickland for this alleged error, he cannot establish that the state court was unreasonable in its application of Strickland.  Accordingly, this allegation cannot

support the petition's claim of ineffective assistance of
appellate counsel.

### 5. Failure to augment the record with jury questionnaires

Petitioner argues that appellate counsel failed to augment
the record with the juror questionnaires and failed to raise the
issue of unconstitutional jury composition as presented in claim
five. It is not clear to what juror questionnaires Petitioner
refers. Exhibits 174 through 183 include questionnaires of all
potential jurors who filled out questionnaires specific to his
trial. Thus, these questionnaires are part of the record.

In claim five, Petitioner argues among other things that he
was denied a fair and impartial jury pool composed of a cross
section of the community. As discussed above, however, this claim
is without merit. Thus, Petitioner cannot show that appellate
counsel was deficient for failure to augment the record, or that
he was prejudiced by any such failure. Accordingly, this
allegation cannot support the petition's claim of ineffective
assistance of appellate counsel.

### 6. Failure to raise trial court's error in denying the motion for a separate penalty phase jury

Petitioner argues that appellate counsel unreasonably failed
to assign as error on appeal "the trial court's improper denial of
petitioner's motion for a separate penalty phase jury, or to
question the jury after the guilt phase, and the constitutionally
inadequate and misleading nature of the voir dire at petitioner's
trial." Am. Pet. at 296-297. He claims that the "trial court's
ruling deprived [him] of his statutory right to two juries under

California Penal Code section 190.4(c)." Id. at 296.  This claim is moot except to the extent it attacks the voir dire at his trial.

California Penal Code section 190.4, subdivision (c) provides that the same jury shall consider the guilt and the penalty phases of a capital trial absent good cause for discharging the guilt phase jury.  The California Supreme Court has stated that "there is a "'long-standing legislative preference for a single jury to determine both guilt and penalty.'" People v. Catlin, 26 Cal. 4th 81, 114 (2001) (citing People v. Lucas, 12 Cal. 4th 415, 483 (1995)).  The court explained further that "the 'mere desire' of defense counsel 'to voir dire in one way for the guilt phase and a different way for the penalty phase,' . . . 'does not constitute "good cause" for deviating from the clear legislative mandate.'" Id. (citing same).

Petitioner argues that his defense counsel was "forced to elect between engaging in the necessary voir dire with the attendant contamination of jurors as to the guilt phase evidence, or foregoing that voir dire to prevent prejudice to petitioner's guilt phase defense that he was not present." Am. Pet. at 44. However, this is precisely the type of argument that the California Supreme Court has stated is not "good cause" for having a separate jury.  See Catlin, 26 Cal. 4th at 115 (explaining that this situation "constitutes a common problem arising out of inconsistent defense strategies at the guilt and penalty phases of trial, yet such inconsistencies do not, without more, constitute good cause for empanelling separate guilt and penalty phase juries").

United States District Court
For the Northern District of California

Accordingly, Petitioner cannot show that appellate counsel was deficient for failure to raise this issue on direct appeal, or that he was prejudiced by that decision.  Thus, this allegation cannot support the petition's claim of ineffective assistance of appellate counsel.

> 7.   Failure to raise trial court's error in denying Petitioner's right to confrontation

Petitioner argues that appellate counsel unreasonably failed to assign as error on appeal "trial court rulings which deprived petitioner of his right to confrontation and cross examination, compulsory process, and the right to effective assistance of counsel and to which trial counsel objected."  Am. Pet. at 297. Petitioner contends:

> These include the trial court's rulings preventing trial counsel from cross-examining Cynthia Ontiveros with respect to specific occasions on which she lied to law enforcement; from eliciting testimony from Zavala about the arguments he had with his brother concerning drugs; from questioning Zavala about the drug business; and, from cross-examining Zavala on the nature and quantity of drugs used by Zavala and Barragan that day.

Id.  He also claims, "To the extent trial counsel was ineffective for failing to properly raise these matters with the trial court, appellate counsel was required to raise this facet of the claim as well."  Id.

Petitioner offers only a conclusory statement that, had appellate counsel raised these issues, the California Supreme Court would have granted relief.  This statement is inadequate to support a claim of ineffective assistance of appellate counsel. Petitioner fails to state any basis for appellate counsel raising

United States District Court
For the Northern District of California

these issues, or how he was prejudiced by appellate counsel's failure to do so.

Given that Petitioner fails to establish that his appellate counsel was deficient under Strickland for these alleged errors, he cannot establish that the state court was unreasonable in its application of Strickland.  Accordingly, this allegation cannot support the petition's claim of ineffective assistance of appellate counsel.

The record supports the state court's conclusion that appellate counsel was not ineffective for the above decisions. Thus, Petitioner has not shown that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  The petition's claim for relief on the ground that appellate counsel was ineffective is DENIED.

W.   Claim forty-seven: cumulative error

Petitioner argues that, given all the alleged constitutional violations discussed above, the cumulative effect deprived him of a fair trial and rendered his convictions unreliable.

As discussed, all of Petitioner's claims fail.  Accordingly, the petition's claim for relief on the ground of cumulative error is DENIED.

CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED.  Petitioner's discovery requests are DENIED, and Petitioner's motion for an evidentiary hearing

United States District Court
For the Northern District of California

is DENIED.  Petitioner is GRANTED a certificate of appealability
as to claim one, claim three and claim nine relating to
Petitioner's competency, as well as claim four relating to Juror
Langston.  The Clerk of the Court shall enter judgment and close
the file.  The parties shall bear their own costs.

        IT IS SO ORDERED.

Dated: September 6, 2016

_____
CLAUDIA WILKEN
United States District Judge